UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSQUEHANNA SECURITIES, LLC and SUSQUEHANNA INVESTMENT GROUP,<br><br>                                     Plaintiffs,<br><br>              - against -<br><br>JOHN DOES 1 THROUGH 100,<br><br>                                     Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Susquehanna Securities, LLC and Susquehanna Investment Group (together, "Susquehanna" or "Plaintiffs") hereby bring this Complaint making the following allegations against defendants John Does 1 through 100 (collectively, "Defendants"), based upon knowledge as to their own acts and upon information and belief as to all others:

### INTRODUCTION

1.       Plaintiffs allege an insider trading scheme that yielded over $100 million in illicit profits just last month.  Specifically, in the two weeks leading up to a May 22, 2026 public announcement of a Chinese government crackdown on cross-border trading platforms, the John Doe Defendants purchased on U.S. exchanges over 200,000 short-dated put options in the stock of two cross-border trading platforms used by many mainland Chinese investors.  Those options were purchased for only approximately $12 million, but were highly lucrative, yielding a profit of over $100 million and a return of over 900%.

2.       While the identities of the Defendants are unknown, the timing, size, type, and pattern of their trading, and the lack of any plausible alternative explanation for the trades, provides powerful evidence that the Defendants traded on material, non-public information

("MNPI") relating to the imminent Chinese crackdown.  Moreover, the highly sensitive and confidential nature of the information; its obvious materiality to the stock price of certain trading platforms; the strict confidentiality policies applicable to anyone who could be expected to have known the information prior to its announcement; and the well-funded, sophisticated, and extraordinarily profitable nature of the Defendants' trading, together provide strong evidence that the trading was in breach of a fiduciary duty or a duty of trust and confidence.

3.    Plaintiffs traded the relevant options contemporaneously with the Defendants.  In fact, Plaintiffs were the sellers for a substantial number of the Defendants' purchases, including trades that resulted in the Defendants making approximately $71 million in illicit profits.  As a result, Plaintiffs have a private right of action against the Defendants for insider trading under Section 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), codified at 15 U.S.C. § 78t-1.  Additionally, Plaintiffs have a claim for unjust enrichment against the defendants under New York law, and are entitled to disgorgement, restitution and an equitable accounting from the Defendants for their illegal insider trading.

## THE PARTIES

4.    Plaintiff Susquehanna Securities, LLC is a Delaware Limited Liability Company headquartered in Bala Cynwyd, Pennsylvania.

5.    Plaintiff Susquehanna Investment Group is a Pennsylvania partnership, headquartered in Bala Cynwyd, Pennsylvania.

6.    Defendants John Does 1 through 100 are as-yet unidentified parties who participated in the alleged insider trading scheme.  The true names of John Does 1 through 100

2

are unknown by Plaintiffs, which therefore sue said Defendants by such fictitious names. Plaintiffs will amend this Complaint to state the true names of the Defendants when they are discovered.

**OTHER RELEVANT ENTITIES**

7.      Futu Holdings Limited ("Futu") is a Cayman Islands corporation with headquarters located in Hong Kong. Futu is a brokerage firm that provides online trading platforms for a variety of securities and other financial assets. Futu stock is listed on the Nasdaq Stock Exchange based in New York, New York, and trades under the ticker FUTU. This complaint uses "FUTU" as shorthand to refer to shares of Futu stock. FUTU stock options trade on the NASDAQ Options Market, based in New York, New York, among other U.S. exchanges.

8.      UP Fintech Holding Ltd ("UP") is a Cayman Islands corporation with headquarters located in Singapore. UP is a brokerage firm that provides online trading platforms for a variety of securities and other financial assets, and operates under the brand Tiger Brokers in Asia. One of UP's subsidiaries is TradeUP Securities, Inc. ("TradeUP"), a New Jersey corporation headquartered in New York, New York, that operates an electronic trading platform. UP's stock trades on the Nasdaq Stock Exchange, based in New York, New York, under the ticker TIGR. This complaint uses "TIGR" as shorthand to refer to shares of UP stock. TIGR stock options trade on the NASDAQ Options Market, based in New York, New York, among other U.S. exchanges.

9.      Interactive Brokers Group, Inc. ("Interactive Brokers") is a Delaware corporation with headquarters in Greenwich, Connecticut. Interactive Brokers operates an electronic trading platform.

3

4938-6288-3768.1

**JURISDICTION AND VENUE**

10.    This Court has jurisdiction over the insider trading claim under 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  This Court has subject matter jurisdiction over the unjust enrichment claim under 28 U.S.C. § 1367(a).

11.    Venue in this District is proper pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because certain acts and/or transactions constituting the violation occurred in this District, including but not limited to (a) the Defendants made a large number of the illicit options purchases on exchanges based in New York, New York, including the Nasdaq Options Market, the Nasdaq MRX Options Exchange, the Nasdaq International Securities Exchange, and the NYSE American Options exchange; (b) the Defendants' illicit options purchases from Plaintiffs were conducted while employees of the Plaintiffs who oversaw the options transactions were located in New York, New York; and (c) the Defendants used a trading account at TradeUP, which is based in New York, New York, to execute the insider trading scheme.

12.    Pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), this Court has personal jurisdiction over the Defendants under New York's long arm statute, N.Y. C.P.L.R. 302(a)(1)-(2), because the Defendants purposefully directed their insider trading scheme at New York by, *inter alia*, trading options in a stock that is listed on the Nasdaq Stock Exchange in New York; trading those options on exchanges based in New York; using a brokerage account at a firm based in New York; and causing harm that the Defendants knew was likely to be suffered in New York and that was, in fact, suffered in New York by the Plaintiffs.

**FACTUAL ALLEGATIONS**

**The Public Announcement of a Chinese Government Crackdown on Offshore Brokers**

13.    On May 22, 2026, at approximately 4:33 am Eastern Daylight Time, Reuters published an article titled "China to crack down on 'illegal' cross-border securities" (the

"Crackdown News").  The article reported that "China announced a major crackdown on cross-border investment on Friday [May 22, 2026] and said it would punish brokers it accused of illegally moving money to foreign markets, sending their shares plunging."  The article further stated that "[o]nline brokers Tiger, Futu and Longbridge would be penalised for soliciting business in China without an onshore licence, the securities regulator said," and that "[s]hares in Futu and Tiger parent UP Fintech Holding fell more than 30% in U.S. premarket trade."[1]

14.    Also on May 22, 2026, Futu and UP each publicly announced that they had received notices of enforcement actions from the China Securities Regulatory Commission (the "CSRC") relating to the companies' operations in China.

15.    In Futu's May 22 announcement, a copy of which was publicly filed with the U.S. Securities and Exchange Commission (the "SEC") that day at approximately 9:35 a.m. Eastern Daylight Time, the company announced that it had received a CSRC notice stating that "certain Futu entities in mainland China and Hong Kong . . . without obtaining the requisite licenses or approval, conducted securities business, public fund sales business and futures business in mainland China, in violation of the Securities Law, the Securities Investment Fund Law, and the Futures and Derivatives Law of the People's Republic of China."  According to the announcement, the CSRC notice stated that the regulator proposed to order the relevant Futu entities "to rectify or cease such activities, confiscate illegal gains, and impose fines, with the total proposed penalty amounting to approximately RMB1.85 billion (approximately USD271 million)."  Additionally, the announcement stated that Futu "has maintained ongoing communica-

---

[1] *Available at* https://www.reuters.com/world/asia-pacific/china-crack-down-illegal-cross-border-securities-activities-2026-05-22/ (last visited June 25, 2026).

4938-6288-3768.1

tion with the CSRC and implemented rectification measures in relation to its mainland China operations," suggesting that Futu may have been in dialogue with the CSRC prior to the announcement.[2]

16.    In UP's May 22 announcement, a copy of which was publicly filed with the SEC that day at approximately 9:16 a.m. Eastern Daylight Time, the company announced that "certain subsidiaries of UP . . . received notices . . . indicating that the CSRC Beijing Bureau had initiated an investigation into their suspected illegal operations of securities, fund and futures business, and found that these subsidiaries had conducted unlicensed cross-border securities business and illegal activities relating to the fund and futures business in mainland China."  The UP announcement further stated that the CSRC "has imposed administrative penalties in the aggregate amount of approximately RMB308.1 million and confiscation of illegal income in the aggregate amount of approximately RMB103.1 million."  The announcement also stated that UP was "fully cooperating with the regulatory authorities, and will strictly implement the rectification measures required by the authorities."[3]

**The Crackdown News Caused Massive Drops in the Prices of FUTU and TIGR**

17.    FUTU traded between $122.10 and $125.45 the day prior to the publication of the Crackdown News, with a closing price of $123.86.  The following day, the price of FUTU at the opening of the market (9:30 a.m. Eastern Daylight Time) was $81.08 (a 34.54% decline from closing the prior day), and traded between $80.50 and $94.88 that day.  The chart below depicts FUTU's trading price between April 1 and June 8, including the sharp decline in

---

[2] *Available at* https://www.sec.gov/Archives/edgar/data/1754581/000110465926065484/tm2615466d1_6k.htm (last visited June 25, 2026).

[3] *Available at* https://www.sec.gov/Archives/edgar/data/1756699/000119312526235622/tigr-ex99.htm (last visited June 25, 2026).

4938-6288-3768.1

price on May 22 (which, as discussed in greater detail below, followed a two-week campaign of insider trading purchases by the Defendants).



18.    TIGR traded between approximately $5.72 and $5.96 the day prior to the Crackdown News, with a closing price of $5.84.  The day of the Crackdown News, the price of TIGR at the opening of the market was approximately $4.01 (a 31.34% decline from closing the prior day), and traded between $4.00 and $4.74 that day.  The chart below depicts TIGR's trading price between April 1 and June 8, and shows the sharp decline in price on May 22.



7

**The Defendants Purchased Unprecedented Quantities of
Short-Dated Put Options in FUTU and TIGR Just Before the Crackdown News**

19.    The Defendants engaged in a pattern of high-risk, high-reward trading designed to take advantage of a projected substantial drop in the price of both FUTU and TIGR around the time of the Crackdown News.  Specifically, the Defendants purchased large and unprecedented quantities of short-dated put options in both stocks.  A put option is an option that gives the holder the right (but not the obligation) to sell a particular asset, at a particular price (known as the strike price), during a particular time period.  A "short dated" or "near dated" option is one that expires in a relatively short time period, and is thus riskier than an option with a longer time horizon; this complaint uses "short dated" or "near dated" to refer to options that expire less than 30 days from the time of purchase.  A put option is "out of the money" if the strike price is below the market price, since there is no profit to be made in selling an asset for less than the market price; by contrast, a put option is "in the money" if the strike price is above the market price.  Thus, a purchase of large quantities of near-dated, substantially "out of the money" put options generally represents a prediction that an asset's price will substantially decline in the near future.

20.    As an example, one of the trades at issue was a FUTU put option purchased on May 20, 2026 (when the price of FUTU was approximately $124.58) that provided the right to sell one share of FUTU at a price of $102.45 through May 29, 2026.  At the time of that purchase, the option was inexpensive (approximately $1.50), because the market price of FUTU was substantially higher than the strike price (and thus "out of the money"), and only nine days remained in the life of the option contract.  In other words, for the option to sell FUTU at $102.45 to be worth exercising, the market price would have to drop significantly (more than 17%) in a nine-day period so that the put option was "in the money."  The more significant the

8

price drop, the more valuable the option, since the holder of the option could purchase FUTU at any new lower market price (for example, $81.08 at the opening of the market on May 22, 2026) and then exercise their option to sell FUTU for $102.45, to yield a profit of approximately $19.87 once the cost of the $1.50 option is considered.

21.    During the two-week period leading up to the Crackdown News (May 7, 2026 to May 21, 2026), there was a significant increase in market orders for short-dated FUTU and TIGR put options.  The graph below depicts all such options purchases in the six months leading up to the Crackdown News, illustrating how the increased volume of purchases was a significant aberration.



The graphs below illustrate how this trend was evident for both FUTU and TIGR put options.



4938-6288-3768.1

**The Subject Trades Exhibit Common Features,
Demonstrating a Coordinated Effort**

22.    A substantial proportion of purchases of short-dated FUTU and TIGR put options between May 7, 2026 and May 21, 2026 share common features suggesting that they were part of a coordinated effort.  Most significantly, a large and disproportionate number of overall market purchases fitting these criteria (approximately 76.5%) were made through only three brokerage firms (the "Subject Brokers"): (i) Interactive Brokers; (ii) one of UP's own trading platforms, TradeUP; and (iii) one of Futu's own trading platforms.  In other words, as depicted in the chart below, the substantial increase in demand for these particular types of put options was not evenly distributed across brokerage firms, but emanated principally from users of the three Subject Brokers.



Additionally, while Interactive Brokers is a large brokerage firm with over 5 million customer

4938-6288-3768.1

accounts, only approximately nine such accounts were responsible for making the relevant Interactive Brokers options purchases.[4]  This complaint refers to purchases of short-dated FUTU and TIGR put options between May 7, 2026 and May 21, 2026 through the Subject Brokers as the "Subject Trades"; the Defendants in this action are the unknown traders who placed the Subject Trades.

23.    Many of the Subject Trades share additional common features suggesting they were executed as part of a coordinated effort.  Notably, the Subject Trades were concentrated in particular short-dated put options, most of which were out of the money, and represented a substantial proportion of overall market activity in those contracts.  The chart below depicts the particular options that were the most commonly purchased contracts among the Subject Trades at each of the Subject Brokers (as well as the quantity of these options purchased otherwise), with each row illustrating a different options contract (*e.g.*, the first row indicates the number of TIGR put options purchased with an expiration date of May 29, 2026 and a strike price of $5).

---

[4] Plaintiffs do not have information indicating the number of accounts at Futu or TradeUP that participated in the Subject Trades.

4938-6288-3768.1



Also, the Subject Trades were not evenly distributed over the trading day, but rather were characterized by bursts of purchases in different short-dated FUTU and TIGR put options. The three charts below depict this pattern on three of the heaviest trading days for those purchases, May 7, 19, and 21. In one example indicated by the yellow oval, a large number of short-dated put options were purchased by customers at the Subject Brokers in a burst of activity shortly after 1:30

pm, with the purchases concentrated in six specific options (four types of TIGR options, and two types of FUTU options).



4938-6288-3768.1

### The Subject Trades Were A Substantial Portion of All
### Short-Dated Put Options Purchases for FUTU and TIGR

24.    In total, the Subject Trades resulted in the Defendants acquiring over 50,000 FUTU put option contracts, with especially large numbers of purchases on May 7 (the first day of the coordinated trading campaign) and May 21 (the last), and over 150,000 TIGR put option contracts, with especially large numbers of purchases on May 19 and 21.  Those put option purchases are depicted in the two graphs below (the first showing FUTU purchases, the second showing TIGR purchases), along with the substantial price drop for each of those stocks on May 22 following the Crackdown News.



The Subject Trades were a substantial portion of all short-dated FUTU and TIGR put options in the broader market.  With respect to near-dated FUTU put options, the Subject Trades constituted approximately 87% of purchases on May 7, approximately 67% of purchases on May 14,

14

and approximately 55% of purchases on May 21.  With respect to near-dated TIGR put options, the Subject Trades constituted approximately 98% of purchases on May 13, approximately 75% of purchases on May 19, and approximately 89% of purchases on May 21.

### The Types of Options Purchased by the Defendants Indicates Knowledge of the Crackdown's Timing

25.    The illicit nature of the Subject Trades is demonstrated not only by their timing (commencing two weeks before the Crackdown News), and targeted strike prices (many were substantially out of the money), but also by the selected option expiration dates.  The Subject Trades thus suggest inside knowledge not only of the fact that the Crackdown News was going to be announced, but also its approximate timing.  Approximately 31% of the Subject Trades targeted options that expired the day after the Crackdown News, and approximately 35% targeted options that expired the following week, as depicted in the chart below



The Subject Trades made up a substantial portion of all market purchases for these types of put options, as depicted in the chart below.



**Insider Trading is the Only Plausible Explanation for the Subject Trades**

26.     Upon information and belief, there was no new public information about FUTU or TIGR released between May 7, 2026 and May 21, 2026 that would provide a reasonable basis for the Defendants to place so many high-risk, high-reward purchases of short-dated FUTU and TIGR put options. Neither Futu nor UP released any financial results during that period; Futu's quarterly earnings announcement occurred after the Crackdown News, on May 28, 2026, and UP's quarterly earnings announcement took place on June 2, 2026. Yet despite the lack of negative public news about Futu or UP between May 7 and 21, the Defendants placed unprecedented numbers of trades that would only be profitable if new information emerged in a matter of days or weeks that had a significant negative price impact on the stocks. Indeed, many of the options were purchased *the day before* the Crackdown News on May 22. Those facts provide powerful evidence of trading based on MNPI.

16

**The Circumstances Indicate that the Defendants Traded in Breach of a Duty**

27.    The Defendants' identities are unknown to Plaintiffs.  However, under any plausible scenario, the Defendants placed the Subject Trades in breach of a fiduciary duty or a duty of trust and confidence.  The facts of this case suggest two categories of insiders who could have either traded directly on the MNPI about the imminent Crackdown News or tipped others: (i) Chinese securities regulators; and (ii) Futu and UP personnel who had knowledge of discussions with Chinese securities regulators about the enforcement action.  As discussed in greater detail below, Chinese securities laws impose confidentiality obligations and trading restrictions on the country's securities regulators, and Futu and UP have strict corporate confidentiality and insider trader policies.

28.    China has enacted insider trading laws that specifically apply to securities regulators as part of the Securities Law of the People's Republic of China.  The website of the National People's Congress of the People's Republic of China has published an English-language version of the most recent version of the law, from 2019, which contains provisions barring employees of the country's securities regulator from trading on material nonpublic information.[5]  According to that English-language translation, the law includes the following relevant provisions:

(a) The law broadly prohibits insider trading.  Specifically, Article 50 provides that "[a]ny insider, or any other person who has unlawfully obtained inside information is

---

[5] *Available at* http://en.npc.gov.cn.cdurl.cn/2019-12/28/c_674672.htm (last visited June 25, 2026).

4938-6288-3768.1

prohibited from taking advantage of the inside information to engage in securities transactions"[6] Further, Article 53 provides that "insiders, and other persons who have unlawfully obtained such inside information shall not purchase or sell the securities of the company concerned, or divulge such information, or advise other persons to purchase or sell such securities before the inside information is publicized."

        (b) The law includes multiple provisions that apply to the conduct of securities regulators in particular, and makes clear that regulators are prohibited from trading on any inside information by virtue of their official positions, or through any other means, or tipping others about inside information.  Specifically, Article 51 states that "[i]nsiders include . . . [s]taff members of securities regulatory body who may obtain inside information by virtue of their duties or work," as well as "[s]taff members of the relevant authorities and regulatory authorities who may obtain inside information by virtue of their statutory duties in the administration of issuance and transaction of securities, or in the administration of acquisition and significant assets transactions of a listed company . . . ."  Article 54 expands those restrictions even further, providing that "the staff members of the relevant regulatory departments . . .  shall be prohibited from using other undisclosed information besides inside information obtained by virtue of their positions to engage in securities transaction activities related to such information or explicitly or implicitly advising others to engage in the relevant transaction activities in violation of regulations."

---

    [6] Article 52 defines "inside information" as "nonpublic information that concerns the business operations or financial conditions of an issuer or that may have a major effect on the market price of the securities of the issuer in securities transactions."

4938-6288-3768.1

29.    Futu publicly filed a copy of its internal company policy concerning MNPI and insider trading in an April 2026 SEC filing.  That policy bars Futu personnel from purchasing or selling the company's securities while in possession of MNPI relating to Futu, or from directly or indirectly disclosing such information to anyone who trades in securities.  Particularly relevant here, the policy notes that one example of material information includes "material litigation, administrative action or governmental investigations or inquiries about the Company or any of its officers or directors."  Additionally, the policy contains broad general confidentiality provision barring any director, officer, employee or consultant from communicating material non- public information about the company "to anyone outside [Futu] under any circumstances unless approved by" a compliance officer in advance.[7]

30.    UP publicly filed a copy of its internal company policy concerning inside and confidential information in an April 2025 SEC filing.  That policy applies to both "confidential information," broadly defined to include "non-public information related to the [company's] businesses or clients," as well as "inside information," defined to include "material, nonpublic information relating to the securities, business, or financial conditions of a corporation, public entity or other issuer of securities."  The policy notes that "inside information" may include, among other things, "[i]nvestigations or actions by government or regulatory authorities."  The policy bars UP employees from disclosing confidential information, defined to include "non-public information related to the [company's] businesses or clients."  The policy broadly prohibits the disclosure of any confidential information, stating that "[e]mployees may not, during their

---

[7] *Available at* https://www.sec.gov/Archives/ed-gar/data/1754581/000110465926043451/futu-20251231xex11d2.htm (last visited June 25, 2026).

employment or a period of time thereafter, disclose confidential information, regardless of the source of the information," and that "[e]mployees must exercise extreme care to avoid disclosing inside and confidential information." The policy requires employees to certify their receipt and understanding of the policy when they are hired, and on an annual basis thereafter.[8]

31.     Together, these laws and policies cover the field of plausible sources of MNPI about the imminent Crackdown News. Additionally, the sensitive nature of the MNPI (an upcoming government enforcement action against multiple public companies), and its obvious potential use for insider trading, make it implausible the information would have been inadvertently or casually tipped to an outsider without a personal benefit for the insider. Moreover, the well-funded, sophisticated, and extraordinarily profitable nature of the Subject Trades themselves reinforces the notion that they were part of a calculated insider trading scheme.

### The Defendants Profited Over $100 Million From the Insider Trading Scheme, Including From Contemporaneous Trading With the Plaintiffs

32.     The Defendants' insider trading scheme paid off handsomely. In total, the Defendants paid premiums of approximately $12 million for the Subject Trades, and made at least $100 million in total profits from those trades.

33.     The Defendants' scheme directly harmed the Plaintiffs, as the Plaintiffs served as counterparties for a substantial portion of the Subject Trades. With respect to the Subject Trades in which the Plaintiffs served as counterparty, the Defendants paid total premiums of $6.7 million and obtained profits of approximately $71.4 million.

---

[8] *Available at* https://www.sec.gov/Archives/edgar/data/1756699/000095017025056953/tigr-ex11_2.htm (last visited June 25, 2026).

20

34.     The Defendants' profits from the Subject Trades mark this as one of the largest documented cases of insider trading in recent memory.  By way of comparison, Raj Rajaratnam's infamous insider trading scheme at Galleon Management yielded only approximately $53 million in profits.

**FIRST CLAIM FOR RELIEF**
**(Insider Trading Private Right of Action Under Federal Law)**

35.     Plaintiffs incorporate by reference and repeat and reallege the allegations of Paragraphs 1 through 34 of the Complaint above as if fully set forth herein.

36.     This claim is brought pursuant to Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, which provides for a private right of action for insider trading.

37.     The Defendants committed illegal insider trading, in violation of 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5, by using material, non-public information to purchase securities, specifically short-dated FUTU and TIGR put option contracts, in breach of a duty of trust and confidence.  These purchases occurred on securities exchanges based in the United States.

38.     The Defendants learned of the MNPI by virtue of their positions as insiders at Chinese securities regulators, Futu, and/or UP, and traded on the MNPI in violation of their fiduciary duty and/or their duty of trust and confidence to the Chinese government, Futu, and/or UP.

39.     Alternatively, the Defendants learned of the MNPI from insiders at Chinese securities regulators, Futu, and/or UP, and those insiders benefitted personally by providing MNPI to the Defendants in violation of their fiduciary duty and/or duty of trust and confidence to the Chinese government, Futu, and/or UP, and the Defendants knew such facts to be the case.

4938-6288-3768.1

40.     Contemporaneously with the Defendants' purchase of short-dated FUTU and TIGR put options, the Plaintiffs sold securities of the same class, and therefore have a private right of action for insider trading under Section 20A.

41.     Plaintiffs were injured financially as a result of the Defendants' illegal insider trading activities.

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment Under New York Law)

42.     Plaintiffs incorporate by reference and repeat and reallege the allegations of Paragraphs 1 through 41 of the Complaint above as if fully set forth herein.

43.     Defendants purchased securities from Plaintiffs while the Defendants were in possession of material, non-public information about those securities and in breach of a duty of trust and confidence, an act that constitutes illegal insider trading.

44.     As a result, Defendants reaped substantial benefits at the expense of the Plaintiffs that it would be unjust for Defendants to retain.

45.     By reason of the foregoing, Plaintiffs are entitled to a judgment against Defendants awarding Plaintiffs restitution in an amount to be determined at the trial of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be awarded in their favor and against Defendants as follows:

(a)     A judgment against Defendants for damages in an amount to be determined at trial, but in any event no less than $71.4 million, plus pre- and post-judgment interest;

(b)     Disgorgement of all profits, benefits and other compensation obtained by Defendants as a result of the misconduct alleged herein;

4938-6288-3768.1

(c)     Ordering Defendants to return the amounts by which they have been un-justly enriched;

(d)     An equitable accounting of the Defendants' profits;

(e)     Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including a reasonable allowance of attorneys' fees and costs of suit; and

(f)     Awarding Plaintiffs such other and further relief as to the Court may seem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs respectfully demand a jury trial on all claims and issues so triable.

Dated:   New York, New York
         June 29, 2026

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP

*/s/ John N. Orsini*
John N. Orsini (jorsini@fklaw.com)
Jared Lenow (jlenow@fklaw.com)
Carolyn Young (cyoung@fklaw.com)
7 Times Square
New York, NY 10036-6516
(212) 833-1100

*Attorneys for Plaintiffs Susquehanna Securities, LLC and Susquehanna Investment Group*

23