UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SUSQUEHANNA SECURITIES, LLC and
SUSQUEHANNA INVESTMENT GROUP,

|                                      | Plaintiffs, | Case No. _____ |

- against -

JOHN DOES 1 THROUGH 100,

Defendants.

<br>

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION OR ATTACHMENT IN THE ALTERNATIVE AND EX PARTE MOTION FOR EXPEDITED DISCOVERY

<br><br>

FRIEDMAN KAPLAN SEILER
 ADELMAN & ROBBINS LLP
7 Times Square
New York, NY  10036-6516
(212) 833-1100

June 29, 2026

*Attorneys for Plaintiffs Susquehanna Securities, LLC and Susquehanna Investment Group*

4938-0350-8408.1

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................1

FACTUAL BACKGROUND .................................................................................................3

    Defendants Accumulate Unprecedented Volumes of Short-Dated Put Options ................3

    The Announcement of a Chinese Government Crackdown on Offshore Brokers
        Causes FUTU and TIGR Stock to Plummet .............................................................4

    Defendants Engaged in a Coordinated Trading Scheme Based Upon Material
        Non-Public Information ..............................................................................................5

    Defendants Reaped Millions in Insider Trading Profits .....................................................9

    Plaintiffs Attempt to Discover the Identities of Defendants ...........................................10

ARGUMENT .........................................................................................................................11

I. A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
    ARE WARRANTED IN THIS ACTION ..........................................................................11

    A.    Susquehanna Will Be Irreparably Harmed Absent a TRO and Preliminary
        Injunction ...................................................................................................................11

    B.    Susquehanna Is Likely to Succeed on the Merits of Its Claims.............................13

        1.    Susquehanna Is Likely to Succeed on Its Claim Pursuant to Section
            20A of the Exchange Act.............................................................................13

        2.    Susquehanna Is Likely to Succeed on Its Unjust Enrichment Claim.........17

        3.    The Balance of Hardships Weighs in Favor of Susquehanna....................18

    C.    The Public Interest Weighs in Favor of a TRO and a Preliminary
        Injunction ...................................................................................................................19

    D.    No Security Should be Required to be Posted.........................................................19

    E.    This Court May Enjoin the Third-Party Brokers ...................................................20

    F.    Courts Routinely Restrain a Defendant's Assets Where Plaintiffs Pursue a
        Claim for Equitable Relief.......................................................................................20

**Page**

II. ALTERNATIVELY, AN ORDER OF ATTACHMENT SHOULD BE ENTERED .............21

    A.    It is Probable that Susquehanna Will Succeed on the Merits ...............................22

    B.    Grounds for Attachment in CPLR § 6201 Exist .....................................................22

    C.    There are No Counterclaims in this Action ...........................................................23

III. PLAINTIFFS' MOTION FOR *EX PARTE* EXPEDITED DISCOVERY SHOULD
    BE GRANTED ..................................................................................................................23

    A.    Susquehanna States a Prima Facie Case. ..............................................................25

    B.    Susquehanna Makes a Specific, Narrow Discovery Request. ...............................25

    C.    There is No Alternative Means to Obtain the Subpoenaed Information. ..............26

    D.    The Subpoenaed Information Is Essential to Advance the Litigation. ..................26

    E.    The PSLRA Stay Should be Lifted Because Plaintiffs Will Suffer Undue
            Prejudice Absent Expedited Discovery. ...............................................................27

IV. AN ORDER PERMITTING ALTERNATIVE MEANS OF  SERVICE IS
    APPROPRIATE...................................................................................................................27

CONCLUSION................................................................................................................................28

4938-0350-8408.1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*adMarketplace, Inc. v. Tee Support, Inc.*,
No. 13 CIV. 5635 LGS, 2013 WL 4838854 (S.D.N.Y. Sept. 11, 2013) ...........................24, 26

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,6
529 F. Supp. 3d 111 (S.D.N.Y. 2021)....................................................................................14

*AIM Int'l Trading LLC v. Valcucine SpA.*,
188 F. Supp. 2d 384 (S.D.N.Y. 2002)....................................................................................11

*In Re Archegos 20A Litig.*,
156 F.4th 108 (2d Cir. 2025) .................................................................................................14

*Ayyash v. Bank Al-Madina*,
233 F.R.D. 325 (S.D.N.Y. 2005) ...........................................................................................24

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA)
Litig.*, No. 09 MDL 2058, 2009 WL 4796169 (S.D.N.Y. Nov. 16, 2009).............................27

*Bank of China, New York Branch v. NBM L.L.C.*,
192 F. Supp. 2d 183 (S.D.N.Y. 2002)....................................................................................22

*Brenntag Int'l Chemicals, Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999)...................................................................................................12

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010)......................................................................................................18

*Digital Sin, Inc. v. Does 1-176*,
279 F.R.D. 239 (S.D.N.Y. 2012) .....................................................................................24, 26

*Doctor's Assocs., Inc. v. Stuart*,
85 F.3d 975 (2d Cir. 1996)......................................................................................................20

*Elkind v. Liggett & Myers, Inc.*,
635 F.2d 156 (2d Cir. 1980).....................................................................................................21

*Ger-Nis Int'l, LLC v. FJB*,
Inc., No. 07 Civ. 898 (RCC), 2007 WL 656851 (S.D.N.Y. Mar. 1, 2007).............................12

*Gordon v. Sonar Cap. Mgmt. LLC*,
92 F. Supp. 3d 193 (S.D.N.Y. 2015).......................................................................................21

4938-0350-8408.1

**Page(s)**

*Grow Universe Inc. v. Doe*,
   No. 1:25 Civ. 1861 (GHW), 2025 WL 1091343 (S.D.N.Y. Mar. 28, 2025) ..........................25

*Gruber v. Gilbertson*,
   No. 16 Civ. 9727, 2019 WL 4458956 (S.D.N.Y. Sept. 17, 2019) ...........................................17

*Gucci Am., Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014)...................................................................................................20

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
   306 F. Supp. 2d 482 (S.D.N.Y. 2004)..........................................................................21, 22, 23

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,
   No. 17 Civ. 07568 (PGG) (KHP), 2018 WL 847014 (S.D.N.Y. Jan. 12, 2018) .....................26

*Myun-Uk Choi v. Tower Research Capital LLC*,
   890 F.3d 60 (2d Cir. 2018)......................................................................................................17

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015).....................................................................................................11

*Newby v. Enron Corp.*,
   188 F. Supp. 2d 684 (S.D. Tex. 2002) .....................................................................................21

*Quantum Corp. Funding, Ltd.* v. *Assist You Home Health Care Servs. of VA. LLC*,
   144 F. Supp. 2d 241 (S.D.N.Y. 2001).......................................................................................21

*S.E.C. v. Compania Internacional Financiera S.A.*,
   No. 11 Civ. 4904 (DLC), 2011 WL 3251813 (S.D.N.Y. July 29, 2011).................................16

*S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharms.*,
   Inc., No. 13 Civ. 4645 (JPO), 2014 WL 5026153 (S.D.N.Y. Sept. 29, 2014)...................15, 16

*S.E.C. v. Unifund SAL*,
   910 F.2d 1028 (2d Cir. 1990).............................................................................................16, 27

*SEC v. Gonzalez de Castilla*,
   145 F. Supp. 2d 402 (S.D.N.Y. 2001).......................................................................................12

*SEC v. One or More Unknown Traders in Sec. of Bioverativ, Inc.*,
   No. 18 Civ. 00701 (JGK), 2018 WL 2244465 (S.D.N.Y. Feb. 9, 2018) ...........................13, 16

*SEC v. One or More Unknown Traders in Sec. of Gen. Commc'n, Inc.*,
   No. 17 Civ. 2659 (KPF), 2017 WL 1407514 (S.D.N.Y. Apr. 13, 2017)...........................13, 16

*SEC v. Watson*,
   659 F. Supp. 3d 409 (S.D.N.Y. 2023)......................................................................................14

4938-0350-8408.1

**Page(s)**

*Strike 3 Holdings, LLC v. Doe*,
   No. 24 Civ. 7286 (VSB), 2024 WL 4728887 (S.D.N.Y. Nov. 8, 2024)............................24, 25

*Tecspec LLC v. Donnolo*,
   No. 25 Civ. 1676, 2026 WL 1361842 (2d Cir. May 15, 2026) ...............................................11

*Tradescape.com v. Shivaram*,
   77 F. Supp. 2d 408 (S.D.N.Y. 1999).....................................................................................18

*Unicon Mgmt. Corp. v. Koppers Co.*,
   366 F.2d 199 (2d Cir. 1966)..................................................................................................11

*United States v. Kosinski*,
   976 F.3d 135 (2d Cir. 2020)..................................................................................................19

*Widakuswara v. Lake*,
   773 F. Supp. 3d 46 (S.D.N.Y. 2025)......................................................................................19

*Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*,
   No. 00 Civ. 8051 (JSM), 2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000) ...............................12

**Statutes and Other Authorities**

15 U.S.C.A. § 78............................................................................................3, 13, 24, 27

CPLR § 6201............................................................................................................... *passim*

CPLR § 6212............................................................................................................... *passim*

Fed. R. Civ. P. 26(d)(1)...............................................................................................24

Fed. R. Civ. P. 64........................................................................................................22

Fed. R. Civ. P. 65..................................................................................................19, 20

v

Plaintiffs Susquehanna Securities, LLC and Susquehanna Investment Group (together, "Susquehanna" or "Plaintiffs") respectfully submit this memorandum of law in support of:  **(i)** its application for a temporary restraining order and preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 65 enjoining defendants John Does 1-100 (collectively, "Defendants") from transferring, encumbering, removing, or otherwise conveying proceeds held in accounts with third-party broker firms TradeUP Securities, Inc. ("TradeUP"), Interactive Brokers Group, Inc. ("Interactive Brokers") and Futu Holdings Limited ("Futu Ltd.") (together, the "Brokers"), that were obtained through Defendants' illegal insider trading activities pending the outcome of this suit, and enjoining Defendants' employees, owners, agents, officers, directors, attorneys, representatives, affiliates, subsidiaries, successors, and assigns, and all those in active concert or participation with them or having knowledge of the causes of action, including the Brokers, from enabling or assisting Defendants in the same, or, in the alternative, an order of attachment pursuant to Federal Rule of Civil Procedure 64 and CPLR §§ 6201, 6212; and **(ii)** an order pursuant to Federal Rule of Civil Procedure 26(d)(1) permitting Plaintiffs to take narrow, expedited third-party discovery (the "Expedited Discovery") in advance of conducting a Rule 26(f) conference, and to lift the discovery stay imposed by the Private Securities Litigation Reform Act ("PSLRA") solely to permit Plaintiffs to take the Expedited Discovery.

## **PRELIMINARY STATEMENT**

Plaintiffs bring this action to recover more than $70 million in illicit profits obtained by certain John Doe Defendants through a coordinated insider trading scheme perpetrated against Plaintiffs as counterparty to Defendants' illegal trades.  Specifically, Defendants used U.S. exchanges to purchase from Plaintiffs approximately $6.7 million worth of short-dated put options in the stock of two cross-border trading platforms used by many

mainland Chinese investors. These trades with Plaintiffs were part of a broader insider trading scheme committed by Defendants that resulted in over $100 million in illegal proceeds. All such orders were placed in the two weeks leading up to a public announcement, made on May 22, 2026, of a Chinese government crackdown on cross-border trading platforms, including specifically the two platforms whose stock Defendants had bet would decline within that same timeframe. Once that announcement was made, the prices of those stocks plummeted, as Defendants knew they would, allowing Defendants to illegally secure tens of millions of dollars in profits at Plaintiffs' expense. The identity of the John Doe Defendants who engaged in illegal insider trading is not known to Plaintiffs at this time, despite Plaintiffs' attempts to uncover such identities.

First, Plaintiffs bring this application for a temporary restraining order and preliminary injunctive relief, or, in the alternative, an order of attachment, in order to prevent the currently-unknown Defendants from transferring the proceeds of their illegal trading out of their brokerage accounts and outside the reach of Plaintiffs. As set forth herein, Plaintiffs satisfy each element of this Circuit's standard to obtain injunctive relief, including a showing of irreparable harm if Defendants are able to abscond with their illegal trading profits; a likelihood of success on the merits of Plaintiffs' claims pursuant to Section 20A of the Exchange Act and common law unjust enrichment; and that injunctive relief here would be in the public interest of maintaining confidence in the integrity of U.S. securities markets. Plaintiffs further satisfy the requirements to obtain an order of attachment pursuant to Rule 64 and CPLR § 6212, as Plaintiffs have shown probability of success on the merits, satisfaction of one of the grounds of attachment provided in CPLR § 6201, and that no counterclaims have been asserted that exceed the amount of Plaintiffs' claims.

4938-0350-8408.1

Second, Plaintiffs seek an order permitting the immediate service of narrowly tailored Rule 45 subpoenas duces tecum upon the Brokers in order to discover the identity of the John Doe defendants who made the relevant trades, and the records of the trades themselves.[1] Plaintiff brings this motion because Federal Rule of Civil Procedure 26(d)(1) provides that parties may not seek discovery prior to conducting a Rule 26(f) conference, absent court order. Further, the PSLRA generally stays discovery pending the outcome of a motion to dismiss, again absent an order on the motion of a party showing that certain particularized discovery is necessary. 15 U.S.C.A. § 78u-4(b)(3)(B). There is good cause to permit Plaintiffs to take narrowly tailored, Expedited Discovery from the Brokers, because without immediate access to the information sought, Plaintiffs will be unable to identify Defendants and proceed with a Rule 26(f) conference, and accordingly will be unable to pursue their claims at all. Plaintiffs have further made the requisite showing that they have made a prima facie case, have no other avenue to identify Defendants, and will be unduly prejudiced without such information.

## FACTUAL BACKGROUND

Plaintiffs in this action are sophisticated market makers that provide critical liquidity to the U.S. securities markets. (Compl. ¶¶ 4-5.) Defendants are presently unidentified traders who participated in the coordinated insider trading scheme described below. (*Id.* ¶ 6.)

### Defendants Accumulate Unprecedented Volumes of Short-Dated Put Options

Beginning on May 7, 2026, and over the course of about two weeks, the John Doe Defendants purchased large quantities of short-dated put options[2] in two securities: FUTU (the

---

[1] The proposed subpoenas to the Brokers are attached to the Declaration of John N. Orsini (the "Orsini Decl.") filed herewith.

[2] A "put option" gives the holder the right to sell a particular security, at a particular strike price during a particular time period. A put option is "out of the money" if the strike price is

3

4938-0350-8408.1

common stock of Futu Ltd., a Cayman Islands brokerage headquartered in Hong Kong) and TIGR (the common stock of Up Fintech Holding Ltd. ("Up Ltd."), a Cayman Islands brokerage that operates the Tiger Brokers platform in Asia). (*Id.* ¶¶ 19-21; Declaration of Nathanael Wickman, dated June 26, 2026 (the "Wickman Decl.") ¶ 8.) Both FUTU and TIGR are listed on the NASDAQ Stock Exchange, and options on both stocks trade on the NASDAQ Options Market and other New York-based exchanges. (Compl. ¶¶ 7–8.)

Purchasing this type of option generally represents a prediction that a security's price will decline in the near future, permitting the holder to profit only if the security's price drops below the strike price before expiration of the option. (*Id*. ¶ 19.) For example, on May 20, 2026, when FUTU traded at approximately $124.58, a Defendant purchased a FUTU put option for approximately $1.50 that gave the holder the right to sell FUTU at $102.45 through May 29, 2026. (Wickman Decl. ¶ 7.) For that option to be worth exercising, FUTU would have had to decline by more than 17% in nine days. (*Id*.) That pattern was repeated tens of thousands of times: between May 7 and May 21, 2026, Defendants acquired more than 50,000 short-dated FUTU put option contracts and more than 150,000 short-dated TIGR put option contracts (the "Subject Trades")—a sharp aberration from the trailing six-months. (*Id*. ¶ 11.)

### The Announcement of a Chinese Government Crackdown on Offshore Brokers Causes FUTU and TIGR Stock to Plummet

At approximately 4:33 a.m. Eastern Daylight Time on May 22, 2026, Reuters published an article reporting that Chinese authorities had announced a sweeping crackdown on cross-border brokers operating without an onshore license, expressly including FUTU and TIGR (the "Crackdown News"). (Compl. ¶ 13.) The article reported that shares of the companies

---

below the market price. A "short dated" option expires in a relatively short time period, and is thus riskier than an option with a longer time horizon. (Wickman Decl. ¶ 6.)

trading as FUTU and TIGR (Futu Ltd. and Up Ltd.) had already fallen more than 30% in U.S. premarket trading. (*Id.*) Hours later, those companies each filed announcements with the SEC confirming receipt of enforcement notices from the China Securities Regulatory Commission ("CSRC"), and disclosed proposed penalties of hundreds of millions of dollars. (*Id.* ¶¶ 14-16.)

The market impact was immediate and severe. FUTU, which had closed at $123.86 on May 21, opened at $81.08 on May 22—a 34.54% one-day decline. (Wickman Decl. ¶ 4.) TIGR, which had closed at $5.84, opened at $4.01—a 31.34% decline. (*Id.* ¶ 5.) The Crackdown News produced precisely the sharp, near-term price decline that would allow Defendants to profit and that their trading strategy was structured to capture. And they did profit: In total, the Defendants made over $100 million in total profits from the Subject Trades— including $71.4 million on trades for which Plaintiffs served as counterparty. (*Id.* ¶¶ 13-14.)

**Defendants Engaged in a Coordinated Trading Scheme Based Upon
Material Non-Public Information**

During the two-week period leading up to the Crackdown News (May 7, 2026 to May 21, 2026), there was a significant increase in market orders for short-dated FUTU and TIGR put options. The graph below depicts all such options purchases in the six months leading up to the Crackdown News, illustrating how the increased volume of purchases was a significant aberration. (Wickman Decl. ¶ 8.)



A substantial proportion of purchases of short-dated FUTU and TIGR put options between May 7, 2026 and May 21, 2026 share common features suggesting that they were part

5

of a coordinated effort.  Most significantly, a large and disproportionate number of overall

market purchases fitting these criteria (approximately 76.5%) were made through only three

brokerage firms: (i) Interactive Brokers; (ii) one of UP Ltd.'s own trading platforms, TradeUP;

and (iii) one of Futu's own trading platforms.  (*Id.* ¶ 9.)  In other words, as depicted in the chart

below, the substantial increase in demand for these particular types of put options was not evenly

distributed across brokerage firms, but emanated principally from users of the three Brokers.

(*Id.*)



The Subject Trades consist of the short-dated FUTU and TIGR put options purchased between

May 7, 2026 and May 21, 2026 through the Brokers; the Defendants in this action are the

unknown traders who placed the Subject Trades.

Many of the Subject Trades share additional common features suggesting they

were executed as part of a coordinated effort.  Notably, the Subject Trades were concentrated in

a small number of specific options contracts rather than spread evenly across the broader options

chain, and represented a substantial proportion of overall market activity in those contracts.  The

4938-0350-8408.1

chart below depicts the particular options that were the most commonly purchased contracts among the Subject Trades at each of the Brokers (as well as the quantity of these options purchased otherwise), with each row illustrating a different options contract (*e.g.*, the first row indicates the number of TIGR put options purchased with an expiration date of May 29, 2026 and a strike price of $5).  (*Id.* ¶ 10.)



Also, the trades were not evenly distributed across the trading day; they arrived in coordinated bursts, with multiple accounts purchasing the same handful of contracts within minutes of one another.  (*Id.*)

7

4938-0350-8408.1

The expiration dates Defendants selected further reveal inside knowledge of the timing—not merely the fact—of the impending announcement.  Approximately 31% of the Subject Trades targeted options that expired the day after the Crackdown News, and approximately 35% targeted options that expired the following week, as depicted in the chart below.  (*Id.* ¶ 12.)



8

The Subject Trades made up a substantial portion of all market purchases for these types of put options, as depicted in the chart below.  (*Id.*)



Finally, no public information released during the relevant window offers any innocent explanation for the Subject Trades.  (Compl. ¶ 26.)  Neither Futu Ltd. nor UP Ltd. released financial results during that period; Futu Ltd.'s quarterly earnings announcement followed the Crackdown News on May 28, and UP's followed on June 2.  (*Id.*)  Defendants nevertheless placed unprecedented volumes of high-risk put option trades that could pay off only if material adverse news emerged on a near-immediate timeline—with many placed the day before the Crackdown News.  (*Id.* ¶¶ 24-25.)

### Defendants Reaped Millions in Insider Trading Profits

Defendants' scheme yielded more than $100 million in profits.  (Wickman Decl. ¶ 13.)  Plaintiffs traded contemporaneously with Defendants and served as counterparty for a substantial portion of the relevant trades; on those trades alone, Defendants paid premiums of approximately $6.7 million while obtaining profits of approximately $71.4 million.  (*Id.* ¶ 14.)

9

**Plaintiffs Attempt to Discover the Identities of Defendants**

Plaintiffs have attempted, but failed, to discover the identity of the John Doe Defendants.  (Sopinsky Decl. ¶¶ 3-8.)  While Plaintiffs have been able to determine the brokerages from which the trades originate, Plaintiffs cannot determine from which accounts the trades were made, nor the owner of such accounts, without serving subpoenas on the Brokers. (*Id.*)

Accordingly, on June 29, 2026, Plaintiffs filed its complaint for violation of the federal securities laws and for unjust enrichment against "John Does 1-100."  As set forth in the proposed Rule 45 subpoenas, Susquehanna seeks from the Brokers only those documents necessary to identify the Defendants and their trades.  Specifically, Schedule A to each subpoena requests production of the following categories of documents:

> 1. Documents sufficient to identify each account that made the Subject Trades, including account number or other individual identifying information.
>
> 2. Documents sufficient to identify the owner of each such account that made the Subject Trades, including the (i) name; (ii) address; (iii) phone number; and (iv) email address of such owner.
>
> 3. All account statements, trade blotters and other records or logs reflecting or referring to the Subject Trades, including records detailing the trade date, security or instrument traded, quantity, price, counterparty, nature of the trade and status of the trade.

(Orsini Decl. Exs. A-C.)  Upon discovery of the identities of the Defendants, Plaintiffs intend to amend the complaint.

4938-0350-8408.1

## ARGUMENT

### I.
### A TEMPORARY RESTRAINING ORDER AND
### PRELIMINARY INJUNCTION ARE WARRANTED IN THIS ACTION

"The general purpose of a preliminary injunction is to preserve the status quo pending final determination of the action."[3] *Unicon Mgmt. Corp. v. Koppers Co.*, 366 F.2d 199, 204 (2d Cir. 1966). Here, Plaintiffs seek a preliminary injunction to maintain the status quo as to Defendants' proceeds from illicit insider trading until this Court has had the opportunity to evaluate the claims set forth in Plaintiffs' Complaint.

In order to obtain a preliminary injunction, a party must establish "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (quotations and citations omitted). Susquehanna satisfies each of these requirements.

### A.    Susquehanna Will Be Irreparably Harmed Absent a TRO and Preliminary Injunction

To satisfy the irreparable harm requirement, "Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Tecspec LLC v. Donnolo*, No. 25 Civ. 1676, 2026 WL 1361842, at *4 (2d Cir. May 15, 2026) (quotations and citations omitted). "[I]rreparable harm [occurs] where, but

---

[3] "The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical." *AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 386 (S.D.N.Y. 2002).

for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

This requirement is met where, as here, there is a "risk that defendant will have dissipated the [funds] without paying the plaintiff, leaving the plaintiff out of luck and out of money." *Ger-Nis Int'l, LLC v. FJB*, Inc., No. 07 Civ. 898 (RCC), 2007 WL 656851, at *2 (S.D.N.Y. Mar. 1, 2007) (internal quotation marks and citation omitted); *see also Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, No. 00 CIV. 8051 (JSM), 2000 WL 1610790, at *1 (S.D.N.Y. Oct. 27, 2000) ("[W]here the particular funds sought to be frozen are also the funds at issue in the suit, a preliminary injunction is proper."). The requirement is met even more forcefully when Defendants are likely to transfer the relevant funds to foreign accounts. *See, e.g., SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 420 (S.D.N.Y. 2001) (granting asset freeze where defendant's "status as a citizen and resident of Mexico with accounts at Mexican banks raises a danger that the funds would be dissipated or transferred beyond this Court's jurisdiction if his account did not remain frozen").

Here, there is a significant risk that Defendants will dissipate, conceal, or remove from the jurisdiction of the Court the proceeds of their insider trades when they discover that Susquehanna has initiated this action or, with respect to accounts temporarily frozen by the Brokers voluntarily, as soon as such accounts are unfrozen. As set forth in the Complaint, Plaintiffs have reason to believe Defendants may be trading through foreign accounts, given that the relevant trades were made in the stock of two cross-border trading platforms used by many mainland Chinese investors, and that the material non-public information ("MNPI") obtained and illegally used to make the relevant trades relates to an imminent announcement regarding a

12

crackdown by the Chinese government relating to cross-border investments.  (Compl. ¶¶ 13-21.)
Should Defendants be alerted to the fact that Plaintiffs intend to seek the return of these
particular funds, they will likely remove them to foreign accounts and out of this Court's
jurisdiction, and any attempt to recover the damages sought in this action will be frustrated.  For
that reason, courts routinely grant temporary restraining orders against John Doe insider trading
defendants when presented with evidence of suspicious trading activity indicative of insider
trading.  *See, e.g., SEC v. One or More Unknown Traders in Sec. of Bioverativ, Inc.*, No. 18 Civ.
00701 (JGK), 2018 WL 2244465, at *1-3 (S.D.N.Y. Feb. 9, 2018); *SEC v. One or More
Unknown Traders in Sec. of Gen. Commc'n, Inc.*, No. 17 Civ. 2659 (KPF), 2017 WL 1407514, at
*1-2 (S.D.N.Y. Apr. 13, 2017).

**B.    Susquehanna Is Likely to Succeed on the Merits of Its Claims**

Susquehanna brings claims against Defendants for (1) breach of Section 20A of
the Exchange Act; and (2) unjust enrichment.  Susquehanna is likely to succeed on the merits of
its claims, and at minimum has raised "sufficiently serious questions going to the merits of [the]
claims to make them fair ground for litigation." *Actavis*, 787 F.3d at 650 (citation omitted).

**1.    Susquehanna Is Likely to Succeed on Its Claim Pursuant to Section 20A of the Exchange Act**

Section 20A of the Exchange Act provides:

> Any person who violates any provision of [the Exchange Act] or the rules or
> regulations thereunder by purchasing or selling a security while in possession of
> material, nonpublic information shall be liable . . . to any person who,
> contemporaneously with the purchase or sale of securities that is the subject of
> such violation, has purchased . . . securities of the same class.

15 U.S.C. § 78t-1(a).  To establish a violation of Section 20A, a plaintiff must (1) "plead a
predicate insider trading violation of the Exchange Act" showing "unlawful trading in securities
based on material non-public information"; and "(2) allege sufficient facts showing that the

defendant traded the security at issue contemporaneously with the plaintiff." *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 175 (S.D.N.Y. 2021) (citations omitted). Plaintiffs are likely to succeed on both requirements of a Section 20A claim.

With respect to the first requirement, there are two theories of insider trading: the classical theory, under which "a corporate insider is prohibited from trading shares of a corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders," and the misappropriation theory, which "targets persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence and who breach a fiduciary duty to the source of the information to gain personal profit in the securities market." *In Re Archegos 20A Litig.*, 156 F.4th 108, 116 (2d Cir. 2025) (internal quotation marks, alterations, and citations omitted). "Under both theories, the person who owes a fiduciary duty of trust and confidence can be liable for using material non-public information to profit by trading on or 'tipping' the confidential information to others." *Id.* Where the alleged violation involves trading by a tippee, it is necessary to show that the tipper received a personal benefit in exchange for providing the confidential information. *Id.* at 116; *see also SEC v. Watson*, 659 F. Supp. 3d 409, 415-16 (S.D.N.Y. 2023) (discussing a variety of circumstances that could satisfy the personal benefit requirement).

As discussed above, there are a multitude of features of the Subject Trades that evidence they were part of a coordinated insider trading campaign *See supra* at pp. 5-10. The sheer number of Subject Trades was unprecedented, and was orders of magnitude greater than purchases of the relevant options in the preceding months. The Subject Trades represented highly risky short-dated put options calibrated to yield significant profits if material adverse news about Futu Ltd. and UP Ltd. emerged on a near-immediate timeline. Moreover, the

14

specific expiration dates of the Subject Trades in large part targeted options expiring either *the day after* the Crackdown News or the following week.  (Wickman Decl. ¶ 12.)  Additionally, the Subject Trades made up a substantial proportion of all market purchases in the relevant options.  (Compl. ¶¶ 21-26; Wickman Decl. ¶ 11.)  Significantly, there is no other plausible explanation for the unprecedented volume of targeted Subject Trades.  (Compl. ¶ 26.)

Additionally, under any plausible scenario, the Defendants placed the Subject Trades in breach of a fiduciary duty or a duty of trust and confidence.  Here, the MNPI on which Defendants traded could only have originated from one of two categories of insiders: (i) Chinese securities regulators directly involved in the enforcement actions; or (ii) personnel at Futu Ltd. or UP Ltd. who were in dialogue with the CSRC in advance of any public announcement.  (*Id.* at ¶ 28.)  Each category was bound by clear legal or contractual confidentiality obligations: (i) Chinese law expressly bars securities regulators from trading on, or tipping to others, MNPI obtained through their official positions (*see id.* ¶ 29); and Futu Ltd. and UP Ltd. have likewise adopted formal insider trading and confidentiality policies that flatly prohibit the conduct at issue (*see id.* ¶¶ 30-31.)  *See S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharms.*, Inc., No. 13 Civ. 4645 (JPO), 2014 WL 5026153, at *7 (S.D.N.Y. Sept. 29, 2014) ("Given the strict confidentiality agreements in place, it is plausible to infer that any information leaked about the Life and Onyx negotiations was leaked in violation of a fiduciary duty.").

Finally, to the extent the Defendants are tippees, it is implausible that the tippers did not receive a personal benefit for disclosing the MNPI traded upon, given the sensitive nature of the MNPI (an upcoming government enforcement action against multiple public companies), and its obvious potential use for insider trading.  (*Id.* ¶ 40.)  That conclusion is reinforced by the well-funded, sophisticated, and extraordinarily profitable nature of the Subject Trades, which

15

4938-0350-8408.1

suggests they were part of a calculated insider trading scheme where both tippers and tippees benefited.  At this early stage, when the John Doe defendants have not yet been identified, their perfectly timed, highly risky, and aberrational options trading, along with the other surrounding circumstances, provide a sufficient evidentiary basis for a temporary restraining order.  *See, e.g., S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1029, 1040-42 (2d Cir. 1990) (upholding preliminary injunction imposing asset freeze in insider trading case in light of evidence of "unusual trading" leading up to a merger announcement that provided "a basis to infer" the [defendants] traded on inside information," even though plaintiff had "not identified the person or entity alleged to have conveyed inside information to" the defendants); *One or More Unknown Traders in Sec. of Bioverativ, Inc.*, 2018 WL 2244465, at *1-2 (issuing preliminary injunction and ordering expedited discovery against John Doe insider trading defendants based on suspicious pattern of trading); *One or More Unknown Traders in Sec. of Gen. Commc'n, Inc.*, 2017 WL 1407514, at *1-2 (same); *One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*, 2014 WL 5026153, at *7 (extending asset freeze in insider trading suit, and finding that "although the SEC has not alleged the identity of the tipper or the specific content of the tip, the overall circumstances of these two sets of trades, in conjunction with one another, make it plausible that [two defendants] acted on an actual tip about Life and Onyx consisting of material nonpublic information"); *S.E.C. v. Compania Internacional Financiera S.A.*, No. 11 Civ. 4904 (DLC), 2011 WL 3251813, at *10-11 (S.D.N.Y. July 29, 2011) (granting preliminary injunction imposing asset freeze in insider trading matter where "on its own, [defendant]'s suspicious trading activity provides an inference of insider trading," despite that plaintiff had not identified the alleged insider source of MNPI).

With respect to the second factor, "a plaintiff must allege the dates on which a

16

defendant sold his stock to establish that the parties' trades occurred contemporaneously," which, "based on the Second Circuit's non-restrictive definition of contemporaneousness," must be "within a reasonable time period, usually limited to a few days, of each other." *Gruber v. Gilbertson*, No. 16 Civ. 9727, 2019 WL 4458956, at *2 (S.D.N.Y. Sept. 17, 2019) (citations omitted). Here, the Subject Trades occurred contemporaneously given that Plaintiffs are the direct counterparty to a large number of the trades. (Wickman Decl. ¶ 14; Compl. ¶ 40.) All such trades were, accordingly, made contemporaneously and on the same date as Defendants' trades.

  **2.**  <u>Susquehanna Is Likely to Succeed on Its Unjust Enrichment Claim</u>

To succeed on its unjust enrichment claim, Susquehanna must establish "(1) that the defendant[s] benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (citation omitted).

First, Defendants were clearly enriched. The Defendants engaged in a pattern of trading based on their knowledge of MNPI designed to take advantage of a projected substantial drop in the price of FUTU and TIGR around the time of the Crackdown News. And they were successful at this fraud: in total, the Defendants made over $100 million in total profits from the Subject Trades. (Compl. ¶ 32.) With respect to the Subject Trades in which the Plaintiffs served as counterparty, Defendants paid total premiums of just $6.7 obtained profits of approximately $71.4 million. (*Id.* ¶ 33.)

Second, this enrichment was at Plaintiffs' direct expense. As noted above, Plaintiffs were the direct counterparty to Defendants on the majority of the Subject Trades. As a result of those trades Defendants obtained profits of approximately $71.4 million from Plaintiffs which, absent their illicit use of MNPI, they would not have secured. (*Id.*)

17

Finally, equity and good conscience require the return of these funds. Defendants used MNPI to profit from Plaintiffs in breach of the federal securities laws and in violation of (i) Chinese trading laws which bars government "insiders, and other persons who have unlawfully obtained such inside information" from trading on MNPI; and/or (ii) company insider trading policies filed with the SEC that prohibit insiders from using "inside information." (*Id.* ¶¶ 27-29.) Equity and good conscience require that Defendants are not rewarded for breaking the law and for stripping Plaintiffs of millions of dollars illegally secured. And equity and good conscience require that such funds be returned *to Plaintiffs*, as the direct counterparties on many of the Subject Trades who have lost millions due to Defendants' conduct.

### 3.      The Balance of Hardships Weighs in Favor of Susquehanna

Even if Susquehanna had not demonstrated likelihood of success on the merits, the Court may nonetheless "grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). This "balance of hardships" inquiry "asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999).

Should this Court grant Plaintiffs' motion for a temporary restraining order and preliminary injunction, Defendants will not suffer, let alone suffer "grievously." Indeed, Defendants' illicitly obtained funds will remain frozen and would be available to Defendants should this Court ultimately reject Plaintiffs' claims. Plaintiffs, on the other hand, may lose tens of millions of dollars if Defendants are permitted to remove their ill-gotten gains from their brokerage accounts and dissipate such funds and/or remove them overseas and out of Plaintiffs'

18

reach.  There is no doubt here that Plaintiffs will suffer "most grievously" if the Motion is denied.

**C.**     **The Public Interest Weighs in Favor of a TRO and a Preliminary Injunction**

Finally, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief … pay[ing] particular regard for the public consequences" that would result in granting or denying the emergency relief sought.  *Widakuswara v. Lake*, 773 F. Supp. 3d 46, 61 (S.D.N.Y. 2025) (citation omitted).

Here, the public interest weighs strongly in favor of enforcing this nation's securities laws and ensuring investor confidence in the integrity of the U.S. securities markets. Courts in the Second Circuit have consistently identified the protection of market integrity and investor confidence as a core rationale for insider trading liability.  *See, e.g.*, *United States v. Kosinski*, 976 F.3d 135, 144 (2d Cir. 2020) (the "animating purpose of the Exchange Act [is] to insure honest securities markets and thereby promote investor confidence," and noting that "investors likely would hesitate to venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law") (citations omitted).  At bottom, the public is ill served by permitting Defendants to retain proceeds earned through illegal trading, and denying Defendants' the injunctive relief sought will chip away at investor confidence in the markets.

**D.**     **No Security Should be Required to be Posted**

Rule 65(c) provides that a preliminary injunction or temporary restraining order may issue "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  Whether to require posting of a security, and the amount of any such

19

security, is at the Court's discretion. *See Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (affirming district court's decision to dispense with security where defendants did not show they would suffer harm absent posting of a bond).

The purpose of posting security is to compensate defendants for the "costs and damages" they would sustain if a preliminary restraint is wrongfully imposed. Here, Defendants will not incur any costs or damages if they are prevented from transferring funds from their brokerage accounts through which they engaged in insider trading. If Plaintiffs ultimately fail to show that Defendants breached the securities laws, such amounts will remain available to Defendants once any injunction is lifted. Defendants will incur no costs or other damages in connection with freezing such accounts, and accordingly, Plaintiffs should not be required to post any security.

E.    **This Court May Enjoin the Third-Party Brokers**

It is appropriate to enforce this temporary restraining order and preliminary injunction against Defendants' assets, and also specifically as against the third-party Brokers. An order made pursuant to Rule 65 binds "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)," as long as such persons "receive actual notice." Fed. R. Civ. P. 65(d). Here, Plaintiffs intend to serve the non-party Brokers immediately with any order restraining Defendants' assets.

F.    **Courts Routinely Restrain a Defendant's Assets Where Plaintiffs Pursue a Claim for Equitable Relief**

Courts may award a preliminary injunction and temporary restraint upon a defendant's assets where, as here, a plaintiff is "pursuing a claim for final equitable relief [] and the preliminary injunction is ancillary to the final relief." *Gucci Am.*, *Inc. v. Weixing Li*, 768

20

F.3d 122, 131 (2d Cir. 2014).

Here, Plaintiffs bring an unjust enrichment claim and seek equitable remedies of disgorgement, restitution and equitable accounting.  Accordingly, the relief sought by way of this motion is proper.  *See Quantum Corp. Funding, Ltd.* v. *Assist You Home Health Care Servs. of VA. LLC,* 144 F. Supp. 2d 241, 250 n.9 (S.D.N.Y. 2001) ("[W]here plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets."); *Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 699-700 (S.D. Tex. 2002) (holding that a plaintiff in a Section 20A suit can pursue equitable restitutionary remedies of a constructive trust and an equitable accounting for profits, and observing that "[t]he case law and commentary on section 20A consistently observe that it provides for the disgorgement of the defendant's profits to a private plaintiff," and that the relevant legislative history "indicates that Congress intended to provide private plaintiffs with the express remedy of disgorgement of the benefits obtained by insider defendants trading securities in violation of section 20A"); *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 172–73 (2d Cir. 1980) (disgorgement is an available remedy in a Section 20A lawsuit) (superseded by statute on other grounds); *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 203-05 (S.D.N.Y. 2015) (discussing *Elkind*, and noting that "the Court retains discretion regarding the appropriate measure of damages and may ultimately decide that a disgorgement measure, without any offset for countervailing gains, is appropriate").

## II.
## ALTERNATIVELY, AN ORDER OF ATTACHMENT SHOULD BE ENTERED

In the alternative, Plaintiffs seek an order of attachment, which "may be granted where the plaintiff has demanded and would be entitled to a money judgment."  *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 484 (S.D.N.Y. 2004).  Susquehanna seeks an attachment only in the alternative to the extent this

21

Court declines to award a temporary restraining order and preliminary injunction with respect to the Defendants' ill-gotten trading proceeds.

Federal Rule of Civil Procedure 64 permits plaintiffs to seize property "to secure satisfaction of [a] potential judgment." Fed. R. Civ. P. 64(a). Under Rule 64, a federal court employs the attachment procedures provided by the law of the state in which the court sits. Fed. R. Civ. P. 64(a). In New York, CPLR § 6212 governs and requires a movant to show "that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." CPLR § 6212(a).

All such elements are met here, and the circumstances of this case are emblematic of the "twin functions" that "New York's attachment statute is designed to serve": "obtaining jurisdiction over nondomiciliaries and preventing defendants from frustrating judgments by transferring or secreting assets out of New York." *Bank of China, New York Branch v. NBM L.L.C.*, 192 F. Supp. 2d 183, 187 (S.D.N.Y. 2002).

## A.    It is Probable that Susquehanna Will Succeed on the Merits

With respect to determining whether Susquehanna has shown its probable success on the merits in granting an attachment, "all legitimate inferences should be drawn in favor of the party seeking the attachment." *JSC Foreign Econ. Ass'n*, 306 F. Supp. 2d at 485. For the reasons already stated herein (*see supra* at pp.14-19), Susquehanna has shown likely success on the merits in this action.

## B.    Grounds for Attachment in CPLR § 6201 Exist

The Court may order an attachment if one or more grounds set forth in CPLR § 6201 are met. CPLR § 6212(a). CPLR § 6201 permits pretrial restraint of assets that would be available to support a money judgment under a range of circumstances, including when a

22

"defendant is a nondomiciliary residing without the state."  CPLR § 6201(1).

Upon information and belief, and pending the outcome of the Expedited Discovery sought by Defendants in this action, there is reason to believe this factor is met because Defendants are likely nondomiciliaries residing outside of New York.  That is because Defendants illegally traded upon material non-public information that is likely to be in the possession of a Chinese government official or employee of one of two companies whose operations are principally located overseas.  (Compl. ¶ 27.)  In such a circumstance it is appropriate to order an attachment upon the relevant assets pending the outcome of Expedited Discovery.

**C.      There are No Counterclaims in this Action**

Finally, to be entitled to an order of attachment, a party must also show that the amount it seeks exceeds all known counterclaims.  *See* CPLR § 6212(a).  Where, as here, "the defendants have not set forth any counterclaims in the papers before the Court, the amount demanded from the defendants exceeds the amount of all counterclaims known to the plaintiff."  *JSC Foreign Econ. Ass'n*, 306 F. Supp. 2d at 485.

Here no counterclaims have been filed against Plaintiffs nor is there any potential cause of action against Plaintiffs, who were victims of Defendants' insider trading.  This factor accordingly supports the grant of an attachment.[4]

**III.**
**PLAINTIFFS' MOTION FOR *EX PARTE***
**EXPEDITED DISCOVERY SHOULD BE GRANTED**

Federal Rule of Civil Procedure 26(d)(1) provides that "[a] party may not seek

---

[4] For the same reasons stated *supra* at Section I.D., any undertaking required pursuant to CPLR § 6212(b) should be fixed at the minimum amount of $500.

discovery from any source before the parties have conferred as required by Rule 26(f), ***except . . . when authorized by these rules, by stipulation, or by court order***."  Fed. R. Civ. P. 26(d)(1) (emphasis added).  The PSLRA further stays discovery pending the outcome of a motion to dismiss, "unless the court finds upon the motion of any party that particularized discovery is necessary to . . . prevent undue prejudice to that party."  15 U.S.C.A. § 78u-4(b)(3)(B). Susquehanna seeks an order permitting the service of three Rule 45 subpoenas on the third-party Brokers immediately, to uncover the identity of the Defendants in this case.

To assess whether to grant expedited discovery, Courts in this Circuit have applied a "flexible standard of reasonableness and good cause," "examin[ing] the discovery request . . . on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances."  *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005) (citation omitted).  In considering reasonableness and good cause, courts consider whether the plaintiff has stated a prima facie case, whether reasonable alternatives exist to obtain the information sought, and whether the information requested is essential to permit the litigation to advance.  *See, e.g.*, *Strike 3 Holdings, LLC v. Doe*, No. 24 Civ. 7286 (VSB), 2024 WL 4728887, at *1 (S.D.N.Y. Nov. 8, 2024) (granting motion for expedited discovery to identify Doe defendant); *Digital Sin, Inc. v. Does 1-176*, 279 F.R.D. 239, 242 (S.D.N.Y. 2012) (same); *adMarketplace, Inc. v. Tee Support, Inc.*, No. 13 CIV. 5635 LGS, 2013 WL 4838854, at *2 (S.D.N.Y. Sept. 11, 2013) (same, holding that "[c]ourts in this district have found 'good cause' for expedited discovery to determine the identity of John Doe defendants where the plaintiff has stated a prima facie case and is unable to identify the defendants without a court-ordered subpoena").

All such factors weigh in favor of granting Susquehanna the narrow and tailored

24

Expedited Discovery it seeks here.

A.    **Susquehanna States a Prima Facie Case.**

Susquehanna more than satisfies its burden to state a prima facie case for purposes of its application for Expedited Discovery, for the reasons already stated herein (*see* supra at pp.14-19).

B.    **Susquehanna Makes a Specific, Narrow Discovery Request.**

Susquehanna seeks narrow, tailored discovery from three non-parties aimed at discovering the identities and trades of Defendants.  As set forth above, Susquehanna seeks only for the Brokers to identify the accounts and individual owners of the accounts that engaged in the trading alleged in the complaint, and produce trading records from such accounts regarding the Subject Trades.  (*See* Orsini Decl. Exs. A-C.)  The requests are eminently reasonable under the circumstances, seeking only the information essential for Susquehanna to identify the relevant traders and nothing more.

Courts routinely approve expedited nonparty discovery of such identifying information.  *See, e.g.*, *Strike 3 Holdings, LLC*, 2024 WL 4728887, at *2 (granting expedited discovery of Rule 45 subpoena requiring internet service provider to "disclose the name and address" associated with certain IP address); *Grow Universe Inc. v. Doe*, No. 1:25 Civ. 1861 (GHW), 2025 WL 1091343, at *1 (S.D.N.Y. Mar. 28, 2025) (granting application for expedited discovery to serve Rule 45 subpoena on Google to identify the name, address, IP address, email address and phone number of Doe defendant).

What is more, the nonparty subpoenas pose no undue hardship to the third parties on which they will be served.  Indeed, the records are easily accessible to the nonparties, and the time it will take to respond to the proposed Subpoenas is negligible. (*See* Sopinsky Decl. ¶¶ 5-8.)

25

**C.    There is No Alternative Means to Obtain the Subpoenaed Information.**

Where, as here, expedited discovery is the sole way for a plaintiff to discover the identities of defendants, expedited discovery is appropriate.  *See, e.g., Digital Sin, Inc.*, 279 F.R.D. at 241–42 (granting expedited discovery to issue Rule 45 subpoena to internet service providers where plaintiffs "have no other way of obtaining the identities of the [defendants]"); *adMarketplace, Inc.*, 2013 WL 4838854, at *2 (collecting cases and holding that in cases involving Doe defendants, courts regularly "have found good cause for expedited discovery to determine the identity of [such] defendants where the plaintiff has stated a prima facie case and is unable to identify the defendants without a court-ordered subpoena").

There is no reasonable alternative means for Susquehanna to obtain the identity and specific trading associated with each of the Defendants—the sole information sought by Susquehanna's discovery requests.  Susquehanna is able to discern the identity of the brokerage firm from which the relevant options orders were placed, but Susquehanna is not privy to the underlying identity of the account holder who placed the relevant trades.  (Sopinsky Decl. ¶ 3.) Susquehanna has contacted the Brokers to seek information about the identities of the account holders behind the traders, but those efforts have been unsuccessful.  (*Id.* ¶¶ 5-8.)

**D.    The Subpoenaed Information Is Essential to Advance the Litigation.**

Finally, the identity of Defendants is essential to permit Susquehanna to pursue the claims asserted in this case.  Requests for expedited discovery to uncover the identity of Jane and John Doe defendants are generally granted in this Circuit in order to permit litigation to proceed.  *See, e.g.*, *Digital Sin, Inc.* 279 F.R.D. at 241–42 (granting expedited discovery as to identity of Doe defendants because without such information "the litigation cannot proceed"); *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, No. 17 Civ. 07568 (PGG) (KHP), 2018 WL

26

4938-0350-8408.1

847014, at *11 (S.D.N.Y. Jan. 12, 2018) ("Discovery to determine the identity of John Doe defendants has been found appropriate.").

As set forth herein, at this time Susquehanna cannot proceed as Defendants' names and contact information reside solely with the Brokers.

**E.    The PSLRA Stay Should be Lifted Because Plaintiffs Will Suffer Undue Prejudice Absent Expedited Discovery.**

The PSLRA stays discovery pending the outcome of a motion to dismiss, "unless the court finds upon the motion of any party that particularized discovery is necessary to . . . prevent undue prejudice to that party."  15 U.S.C.A. § 78u-4(b)(3)(B).  In determining whether to lift the stay, courts in this district "have construed 'undue prejudice' to mean improper or unfair treatment amounting to something less than irreparable harm," and have considered "case management, and the effect of delay" on a plaintiff's ability to pursues its action.  *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, No. 09 MDL 2058 (DC), 2009 WL 4796169, at *2 (S.D.N.Y. Nov. 16, 2009) (citation omitted).

As set forth herein, Plaintiffs cannot pursue their claims absent information identifying the John Doe Defendants that engaged in the illegal insider trading as alleged in the Complaint.  And the discovery sought is particularized and narrow in scope, imposing no burden on Defendants and very limited burden upon the third-party Brokers.

**IV.**
**AN ORDER PERMITTING ALTERNATIVE MEANS OF**
**SERVICE IS APPROPRIATE**

Plaintiffs request authorization to serve Defendants with all documents supporting its *ex parte* application, including the Complaint, via the Brokers.  That will ensure that Defendants obtain prompt notice of this application.  Such alternative means of service is appropriate pursuant to Federal Rule of Civil Procedure 4(f)(3).  *See Unifund SAL*, 910 F.2d at

1033 (service on foreign investor was proper where the papers were delivered to investor's broker, which forwarded the papers to foreign country where they were received by the investor).

## CONCLUSION

For all of the forgoing reasons, Susquehanna respectfully requests that the Court (i) enter a temporary restraining order and preliminary injunctive relief enjoining Defendants from transferring, encumbering, removing, or otherwise conveying proceeds held in accounts with third-party Brokers that were obtained through Defendants' illegal insider trading activities pending the outcome of this suit, or, in the alternative, enter an order of attachment pursuant to Federal Rule of Civil Procedure 64 and CPLR §§ 6201, 6212 with respect to these same proceeds; (ii) enter an order authorizing Susquehanna to immediately serve the third-party subpoenas attached to the Orsini Declaration as Exhibits A, B and C; (iii) and enter an order permitting alternative means of service.

Dated:   New York, New York
         June 29, 2026

FRIEDMAN KAPLAN SEILER &
   ADELMAN LLP

 /s/ John N. Orsini
John N. Orsini (jorsini@fklaw.com)
Jared Lenow (jlenow@fklaw.com)
Carolyn Young (cyoung@fklaw.com)
7 Times Square
New York, NY 10036-6516
(212) 833-1100

*Attorneys for Plaintiffs Susquehanna Securities, LLC
and Susquehanna Investment Group*

28

4938-0350-8408.1

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

Pursuant to Local Civil Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, I certify that the foregoing document complies with the word-count limit, in that it contains 7,702 words, excluding the caption, table of contents, table of authorities, and signature block. In making this calculation, I have relied on the word count of the word processing system used to prepare the document.

Dated:    New York, New York
          June 29, 2026


                                                  _/s/ John N. Orsini_____
                                                      John N. Orsini

4938-0350-8408.1