FRIEDMAN
KAPLAN

**JOHN N. ORSINI**
jorsini@fklaw.com
212.833.1186

August 18, 2026

**VIA ECF**

Honorable Arun Subramanian, U.S.D.J.
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *Susquehanna Securities LLC, et al. v. John Does 1 Through 100,* No. 1:26-cv-05474 (AS) (S.D.N.Y.)

Dear Judge Subramanian:

Plaintiffs in the above-captioned action (the "Action"), Susquehanna Securities, LLC and Susquehanna Investment Group (together, "Susquehanna"), and Plaintiff-Intervenor Citadel Securities LLC ("Citadel Securities," and together with Susquehanna, "Plaintiffs"),[1] write jointly in response to this Court's Order dated August 17, 2026 (ECF 127, the "August 17 Order"), requesting additional information and support for the preliminary injunction Plaintiffs seek to have entered against the 45 Narrowed Defendants.[2]

1. **Authority that indicates that the Court may issue a preliminary injunction against parties pursuant to a moniker—for example, "John Doe"—rather than their formal names (August 17 Order at ¶ 3(1)).**

Courts may issue preliminary injunctions against defendants identified in ways other than by their formal name—including when identified by a moniker ("John Doe" or "Unknown Traders"), an account number, an IP address, or other identifying information. *See, e.g., SEC v. One or More Unknown Traders in Sec. of Bioverativ, Inc.*, No. 18-CV-

[1] Capitalized terms undefined herein shall have the same meaning ascribed to them in Plaintiffs' reply brief (ECF 102, 104).

[2] In addition, Plaintiffs further update the Court that, in accordance with the August 17 Order, Plaintiffs (i) notified the respective Brokers and individual account holders whose information was provided by the Brokers or who independently reached out to Plaintiffs and for whom the prior TRO no longer applies; (ii) filed a notice of dismissal without prejudice as to any individual John Doe Defendant other than the 45 Narrowed Defendants (ECF 132); and (iii) shared all sealed documents that have been filed with or furnished to the Court with counsel for the Narrowed Defendants that have appeared in this Action. Plaintiffs will file a proposed preliminary injunction order with their filing on August 26, 2026, replying to any opposition filed on August 21, 2026.

00701-JGK, 2018 WL 2244465, at *1 (S.D.N.Y. Feb. 9, 2018) (issuing a preliminary injunction freezing proceeds of defendants identified by accounts through which trades were made); *SEC v. One or More Unknown Purchasers of Options of Intermune, Inc.*, No. 10 Civ. 09560 (S.D.N.Y. Jan. 7, 2011), ECF 4 (granting preliminary injunction against unnamed defendants identified as "Defendants Relating to the Purchase of 237 INTM Contracts," and later amending complaint to add named defendants (*see* ECF 20)); *Microsoft Corp. v. Does 1-2*, No. 23-CV-02447-LDH-JRC, 2023 WL 11984986, at *4 (E.D.N.Y. Apr. 19, 2023) (granting preliminary injunction as to John Doe defendants identified by domain addresses and IP addresses of servers); *AW Licensing, LLC v. Bao*, No. 15-CV-1373, 2015 WL 10793466, at *1 (S.D.N.Y. Aug. 7, 2015) (issuing preliminary injunction against "XYZ Companies, John Does, and Jane Does, d/b/a the aliases identified in Schedule A to the Preliminary Injunction Order," where Schedule A contained domain names, aliases and emails). In *AW Licensing*, the court later ordered default judgment and a permanent injunction against John Does, even where the defendants were previously identified. No. 15-CV-1373 (S.D.N.Y.) ECF 50 (Sept. 17, 2015) (identifying defendants), ECF 65 (Aug. 2, 2016) (entering default judgment and permanent injunction over "John Does" and "Jane Does" among other defendants). Because the parties against which Plaintiffs seek to apply the preliminary injunction are a discrete group of 45 defendants holding 47 specifically identified accounts,[3] the Court may utilize the "John Doe" moniker here when issuing the preliminary injunction.[4]

**2. <u>A description of how plaintiffs gave each of the Narrowed Defendants notice and how that process complies with Rule 65's limitations (August 17 Order at ¶ 3(2)).</u>**

Under Rule 65, a preliminary injunction or temporary restraining order is binding on any party "who receive[s] actual notice of it by personal service or otherwise." Fed. R. Civ. P. 65(d)(2). Rule 65 requires only "notice," as opposed to Rule 4, which requires "service" on the party against whom relief is sought. *Overnight Blowout LLC v. Shenzhen Kairuijia E-Com. Co.*, No. 25-CV-6086 (LJL), 2025 WL 2381588, at *3 (S.D.N.Y. Aug. 13, 2025); *see also SEC v. Cap. Growth Co., S.A. (Costa Rica)*, 391 F. Supp. 593, 600 (S.D.N.Y. 1974) ("The sufficiency of notice is for the trial court's determination under the circumstances of each particular case," and the "rule does not specify the kind of notice to be given."). Plaintiffs have satisfied this notice requirement.

Consistent with the authorization of the temporary restraining order (ECF 10, the "TRO") directing service by email and FedEx, Plaintiffs sent the TRO, the documents on which it was ordered, and the Complaint by email to each Narrowed Defendant's email

---

[3] While courts may not issue a preliminary injunction against non-specific John Doe defendants who are identified "only by describing the behavior that plaintiffs want to stop," which "effectively seek[s] to enjoin the world at large, rather than pursuing relief against identified parties," *Stensrud, Inc. v. Does*, 805 F. Supp. 3d 440, 445–46 (E.D.N.Y. 2025), that is not the case here.

[4] To the extent this Court intends to deny Plaintiffs' application for a preliminary injunction on the sole basis that the John Doe defendants have not yet been named, Plaintiffs will withdraw their request to wait until the Amended Complaint to publish the names of each John Doe Defendant, and will provide this Court with an amended proposed order granting the preliminary injunction naming each defendant.

address, and via FedEx to each Narrowed Defendant's physical address, or to their counsel. Those email addresses and physical mailing addresses were largely provided by the Narrowed Defendants' Brokers from account opening documents in response to the expedited discovery that this Court authorized. In *Overnight Blowout*, the court held that emailing Chinese and Hong Kongese defendants TRO papers was sufficient to "discharge [the moving parties'] Rule 65(a) notice obligations," even where email could not satisfy Rule 4's formal service requirement. *See* 2025 WL 2381588, at *3. New York federal courts have likewise approved email notice to a defendant's registered email address (*i.e.*, an address the defendant provided to a platform for official communications) as "reasonably calculated to give notice" of a preliminary injunction. *See Sulzer Mixpac AG v. Medenstar Indus. Co.*, 312 F.R.D. 329, 332 (S.D.N.Y. 2015) (overruled by *Smart Study Co., Ltd v. Shenzhenshixindajixieyouxiangongsi*, 164 F.4th 164, 166 (2d Cir. 2025) as to Rule 4 service, but followed by *Fox Corp. v. Media Deportes Mexico, S. de R.L. de C.V.*, 820 F. Supp. 3d 299, 306 (S.D.N.Y. 2026) as to temporary injunctive relief) (email address on defendant's website sufficient because defendant "presumably relies at least partially on contact through [it] to conduct overseas business, and it is reasonable to expect [the defendant] to learn of the suit against it through this email address"); *Sound Around Inc. v. Shenzhen Keenray Innovations Ltd.*, No. 22-CV-6943 (HG), 2023 WL 5670679, at *5 (E.D.N.Y. July 28, 2023) (email sufficient for preliminary injunction notice where address was "registered with Amazon.com as the email address for [the defendant's] official business dealings with Amazon."); *see also ABC v. DEF*, No. 24CV8341 (DLC), 2024 WL 5168624, at *2 (S.D.N.Y. Dec. 13, 2024) (service to email addresses obtained from Amazon constituted actual notice where counsel "demonstrate[d] that the email [was] likely to reach the defendant") (internal quotation omitted).

Here, notices were sent to the Narrowed Defendants' Broker-registered email and mailing addresses, which the Narrowed Defendants would have provided to the Brokers for purposes of account opening, engaging in trades, and receiving account statements related to their trading. The Narrowed Defendants' email addresses were necessarily "likely to reach [the] defendant[s]" because, if the Narrowed Defendants were unreachable via these email addresses, the Brokers would be unable to comply with their KYC obligations, nor would the Narrowed Defendants have access to information about their accounts. *Id.* Indeed, after Plaintiffs emailed John Does 1 through 45 that they were being pursued, six new counsel entered their notices of appearance on the docket to represent three of these Narrowed Defendants, confirming that notice was not only reasonably likely to reach the Narrowed Defendants, but did in fact reach them.

Furthermore, any notice challenge is foreclosed as to John Does 1, 3, 8, 14, 16, 18, 22, 23, 28, and 41, who have appeared or contacted Plaintiffs through counsel with respect to the temporary restraining order and preliminary injunction. Where a defendant has retained counsel and appeared, "it cannot be seriously argued … that [the defendant] has not received actual notice." *FTS Bus. Consultants, Inc. v. Baker*, No. 26-CV-6251-MAV, 2026 WL 1078215, at *4 (W.D.N.Y. Apr. 21, 2026) (holding that defendant received Rule 65 notice where he retained counsel in the action and counsel also appeared on his company's

behalf). Because these nine Narrowed Defendants have retained counsel to represent them at this stage, to the sufficiency of notice is conceded as to each of them.

Exhibit A, attached hereto, sets forth the details regarding the method of notice provided to each Narrowed Defendant, including the date of email and FedEx notice to the emails and physical addresses set forth in Plaintiffs' certificates of service (ECF Nos. 56 and 63). Accordingly, all Narrowed Defendants have received sufficient notice of the temporary restraining order and preliminary injunction.[5]

3. **Explanation of why a preliminary injunction is appropriate for *each* defendant. This should include authority for the proposition that there is, as plaintiffs put it, a "presumption" of irreparable harm when defendants reside overseas. The discussion should also explain why a preliminary injunction is appropriate with respect to those defendants domiciled in the United States (August 17 Order at ¶ 3(3)).**

A preliminary injunction is appropriate as applied to each of the Narrowed Defendants—both overseas and domestic—because irrespective of the jurisdiction, the highly suspicious trading activity in this action indicates a significant risk that the proceeds from the illicit trading will be removed from the currently frozen accounts and ultimately be unavailable for any eventual award. *See, e.g.*, *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 420–21 (S.D.N.Y. 2001); *SEC v. McGinnis*, No. 13-CV-1047, 2013 WL 6500268, at *5-6 (D. Conn. Dec. 11, 2013). For the majority of the Narrowed Defendants who reside overseas, that risk clearly meets the standard for irreparable harm; and for the two solely-domestic Narrowed Defendants, a preliminary injunction is independently warranted given their failure to appear and the fraud-based insider trading allegations against them.

With respect to overseas defendants, in cases involving analogous allegations of suspicious trading activity, courts have found preliminary injunctions and accompanying asset freezes particularly appropriate because of the potential that assets will be transferred beyond the reach of the court's jurisdiction. For example, in *Gonzalez de Castilla*, the court noted that the defendant's "status as a citizen and resident of Mexico with accounts at Mexican banks raises a danger that the funds would be dissipated or transferred beyond this Court's jurisdiction if his account did not remain frozen." 145 F. Supp. 2d at 420. The court held that "[a]lthough the defendants' nationality, standing alone, is insufficient to warrant freezing their assets, the freeze is justified because (1) the SEC has raised an inference of insider trading; and (2) the fact that the defendants live abroad and use off-shore accounts raises a concern that they may transfer their funds beyond the Court's jurisdiction and

[5] With respect to Narrowed Defendants with subaccounts at the Omnibus Brokers, Plaintiffs are not at this time seeking to freeze the omnibus accounts in their entirety. Rather, with one exception (*see* Ex. A, John Doe 32), the Omnibus Brokers have each agreed to freeze the relevant subaccounts, notice has been provided to (and acknowledged by) the Omnibus Brokers, and in many cases notice has been provided to the subaccount holders themselves (*see* Ex. A). Accordingly, a preliminary injunction as to these subaccounts (for John Does 3, 5, 12, 13, 21, 24, 27, 30, 31, 32, 34, 35, 37) is appropriate.

dissipate the assets available for any eventual award." *Id.* at 420–21; *see also* Plaintiffs' Reply (ECF 102, 104) at 15–16.

The case law on this principle consistently finds that the risk that plaintiffs would be unable to secure relief due to assets being moved beyond the jurisdiction of United States courts, outweighs the burden imposed by injunctive relief. *Hossain v. Mediastar Ltd.*, No. 24 Civ. 1201 (KPF), 2025 WL 2578128, at *6 (S.D.N.Y. Sept. 5, 2025) (granting preliminary injunction restricting asset transfers where defendants had "mov[ed] digital assets from the U.S." and noting that "absent injunctive relief, Plaintiffs could very well end up with a substantial judgment and no means to enforce it"); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 407 F. Supp. 2d 483, 497 n.77 (S.D.N.Y. 2005) (noting that "another factor supporting a finding of irreparable injury" was that "the enforceability of a judgment for damages in this case would be uncertain given [defendant's] presence in Brazil and the parties' use of offshore vehicles to hold assets"), *aff'd and remanded*, 246 F. App'x 73 (2d Cir. 2007); *see also SEC v. One or More Purchasers of Call Options for the Common Stock of CNS*, *Inc.*, 2006 WL 3004875, at *1 (E.D. Pa. Oct. 20, 2006) (extending temporary restraining order upon finding that "the balance of the harms favor[ed] the SEC" because they would be "unable to secure appropriate relief in enforcement proceedings if the assets have already been moved beyond the jurisdiction of the United States courts"); Order Granting Preliminary Injunction Freezing Assets and Granting Other Relief, *SEC v. One or More Purchasers of Call Options for the Common Stock of CNS*, *Inc.,* 06-CV-4540 (E.D. Pa. Oct. 30, 2006), ECF 13.

Here, the substantial majority—43 of 45—of the Narrowed Defendants listed at least one residence outside the United States and/or traded through an omnibus account based overseas. In addition, as explained in Plaintiffs' reply submission and as further discussed below, an individualized analysis of the trading activity of each Narrowed Defendant reveals a pattern of highly suspicious trading activity ahead of the Crackdown News. In the presence of this precise combination of factors, courts routinely grant requests for preliminary injunctions, including an asset freeze.

As the Court recognized, two of the Narrowed Defendants are domiciled in the United States.[6] A preliminary injunction and asset freeze are independently warranted as applied to the Domestic Narrowed Defendants. Courts have granted requests for preliminary injunctions in insider trading cases where defendants are located in the United States. *See SEC v. McGinnis*, No. 13-CV-1047, 2013 WL 6500268, at *5–6 (D. Conn. Dec. 11, 2013) (continuing asset freeze against domestic insider trading defendants to ensure "alleged ill-gotten profits are not dissipated beyond the reach of the court"). In particular, courts recognize that fraud-based offenses increase the need for a preliminary injunction because engaging in fraudulent conduct constitutes prima facie evidence that a defendant may dissipate assets if given access to them, thereby frustrating the court's ability to enforce a judgment. *See Gilead Sciences, Inc. v. Safe Chain Sols., LLC*, 684 F. Supp. 3d 51, 68

[6] *See* Ex. A (categorizing the residences of the Narrowed Defendants based on whether the John Does possess only a U.S. address or have at least one foreign address).

(E.D.N.Y. 2023) (holding that plaintiff met its burden to show that defendants "engaged in a pattern of fraudulent or evasive conduct so as to justify a preliminary injunction freezing assets to satisfy a potential equitable award") (citing *Dong v. Miller*, No. 16-CV-5836, 2018 WL 1445573, at *10 (E.D.N.Y. Mar. 23, 2018) (irreparable harm justified asset freeze where defendants "engaged in a long-running fraud")).

The U.S.-based Narrowed Defendants' failure to appear,[7] coupled with the fact that they face serious allegations of insider trading built on evidence of potentially fraudulent conduct, gives rise to a reasonable inference that they too may seek to dissipate or conceal the proceeds of their trading absent injunctive relief. Indeed, the failure to appear and object to the assertion that they will likely dissipate these proceeds absent a further restraint, and the failure to provide particularized and supported assurances regarding the sufficiency and availability of their assets to cover a U.S. judgment, support entry of an injunction here. Accordingly, the risk that these defendants will dissipate the assets in question if the preliminary injunction is not granted remains sufficiently high to demonstrate a likelihood of irreparable harm to Plaintiffs.

Plaintiffs have thus demonstrated the necessary element of irreparable harm as to all Narrowed Defendants, each of whom has engaged in demonstrably suspicious, fraud-based trading activity, along with some combination of a failure to appear, an overseas domicile, and/or overseas ties, all of which heighten the risk of dissipation absent a preliminary injunction.

4. **Explanation of why Plaintiffs have demonstrated a likelihood of success on the merits as to each defendant (August 17 Order at ¶ 3(4)).**

The Narrowed Defendants' suspicious trading activity is sufficient to establish a likelihood of success on the merits, including pursuant to the serious questions doctrine (addressed more fully below and which remains controlling law in this Circuit). In the case of the serious questions doctrine, the Second Circuit has emphasized the importance of a flexible approach in assessing the merits of a claim, particularly in complex matters. *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30,

[7] Courts have consistently held that a defendant's failure to appear or respond supports entry of a preliminary injunction and evidences a risk that defendants will dissipate the relevant assets. *See A & J Produce Corp. v. JD Produce Maspeth LLC*, No. 25 Civ. 1759, 2025 WL 1384820, at *2 (S.D.N.Y. Apr. 28, 2025) ("Despite ample and timely notice, Defendants have failed to appear in this action or respond to Plaintiffs' allegations. … Accordingly, Plaintiffs have established a likelihood of success on the merits. In addition, there is a likelihood of irreparable harm to Plaintiffs if a prohibitory injunction does not issue, because Plaintiffs' funds may be dissipated") (citation omitted); Order Imposing Preliminary Injunction Freezing Assets and Granting Other Relief, *SEC v. Calabrigo*, 22-cv-3096 (S.D.N.Y. July 7, 2022), ECF 64, at 1–2 (noting as a factor in favor of granting a preliminary injunction that defendant "having been given notice of the [preliminary injunction] hearing and having failed to appear . . . the Commission has made the showing required by Fed R. Civ. P. 65(a) and, in addition, the Commission has shown that (i) it is likely that, unless restrained and enjoined by an order of this Court, [defendant] may dissipate and conceal investor assets that could be subject to an order of disgorgement").

35-36 (2d Cir. 2010). A case turning on a pattern of highly suspicious trading by overwhelmingly offshore actors—exquisitely timed to profit from advance notice of a highly confidential government crackdown—is a complex one that merits a flexible approach to an assessment of the merits.

Plaintiffs' reply submission provided an individualized analysis of the trading of each Narrowed Defendant. Specifically, Exhibit D to the Wickman Declaration (ECF 103, 105) details each particular Narrowed Defendant's profit, return percentage, broker, and location, and includes a chart illustrating each Narrowed Defendant's purchases of short-dated FUTU and/or TIGR put options between May 7 and the early morning of May 22, as well as those options' expiry dates, which were typically immediately or shortly after the Crackdown News. Each individualized analysis reveals a highly suspicious trading pattern consistent with trading based on MNPI in breach of a duty or as part of a tipping scheme. Each Narrowed Defendant's pattern of trading (purchasing short-dated put options, many of which were out-of-the-money and high volume, in concentrated periods just before the Crackdown News) bears the hallmarks of insider trading, and thus it is reasonable to conclude that in light of the applicable corporate confidentiality policies and the highly sensitive nature of the MNPI, the trading was preceded by a breach of duty or a tip, which in turn involves a personal benefit. Plaintiffs are likely to prevail in satisfying the personal benefit element (which, as discussed below, is not a demanding requirement) because, without receiving a benefit, the conduct is economically irrational as the puts were unlikely to be profitable over the short time horizon before expiration. And the tipper clearly breached a duty, given FUTU's and TIGR's clear corporate policies against insider trading, and prohibitions under United States and Chinese law against misusing MNPI while under a duty of confidentiality. Under the circumstances present here, the individualized evidence of each Narrowed Defendant's suspicious pattern of trading in advance of the Crackdown News in which the Narrowed Defendants collectively profited well in excess of $100 million is sufficient to demonstrate a likelihood of success on the merits as to each Narrowed Defendant, and at the very least raises sufficiently serious questions going to the merits to make them a fair ground for litigation.

Further, as to the Plaintiffs' ability to demonstrate the existence of a personal benefit (an element of Plaintiffs' Section 20A claim), the definition of a "personal benefit" is "broad," and "the evidentiary bar is not a high one." *United States v. Chow*, 993 F.3d 125, 142 (2d Cir. 2021) (internal quotation marks omitted). A plaintiff "need not show that the tipper expected or received a specific or tangible benefit in exchange for the tip, and . . . the personal benefit element is satisfied where there is evidence that the tipper intended to benefit the recipient." *Id.* at 141 (internal quotation marks omitted). Courts have found "evidence of a personal benefit sufficient where the tippee gave one tipper an iPhone, live lobsters, a gift card, and a jar of honey, and where the tippee had another tipper admitted into an investment club where the tipper had the opportunity to access information that could yield future pecuniary gain (even though he never realized that opportunity)." *Id.* (internal quotation marks omitted).

Consistent with the foregoing, the Second Circuit, and numerous district courts, have held in cases brought by the SEC that suspicious trading activity can be sufficient to obtain a preliminary injunction freezing proceeds of an insider trading scheme, even if plaintiff has not yet established the identity of the tipper or the personal benefit they received. *See, e.g.*, *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1029, 1040–42 (2d Cir. 1990) (upholding preliminary injunction imposing asset freeze in insider trading case in light of evidence of "unusual trading" leading up to a merger announcement that provided "a basis to infer" the [defendants] traded on inside information," even though plaintiff had identified evidence of a potential tip but had "not identified the person or entity alleged to have conveyed inside information to" the defendants); Order Granting Preliminary Injunction, Extending Asset Freeze and Other Relief at 2–4, *S.E.C. v. One or More Unknown Traders in the Sec. of Anadarko Petroleum Corp.*, No. 19 Civ. 03785 (S.D.N.Y. May 20, 2019), ECF 13 (granting asset freeze where plaintiffs alleged that John Doe defendants made suspicious pattern of short-dated out-of-the-money call option purchases); *S.E.C. v. One or More Unknown Traders in Sec. of Bioverativ, Inc.*, No. 18 Civ. 00701 (JGK), 2018 WL 2244465, at *1–2 (S.D.N.Y. Feb. 9, 2018) (granting preliminary injunction under "basis to infer" standard where there was a suspicious pattern of out-of-the-money call option purchases by John Doe defendants over a one-week period, representing a significant share of all reported trades, shortly before an acquisition announcement); *S.E.C. v. One or More Unknown Traders in Sec. of Gen. Commc'n, Inc.*, No. 17 Civ. 2659 (KPF), 2017 WL 1407514, at *1–2 (S.D.N.Y. Apr. 13, 2017) (issuing preliminary injunction against John Doe insider trading defendants based on suspicious pattern of ramped up purchases of short-dated call options with no previous purchases in prior six months under "basis to infer" standard); *S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharms.*, Inc., No. 13 Civ. 4645 (JPO), 2014 WL 5026153, at *7 (S.D.N.Y. Sept. 29, 2014) (extending asset freeze in insider trading suit for suspicious purchases of majority out-of-the-money calls at historically high rates, and finding that "although the SEC has not alleged the identity of the tipper or the specific content of the tip, the overall circumstances of these two sets of trades, in conjunction with one another, make it plausible that [two defendants] acted on an actual tip about Life and Onyx consisting of material nonpublic information"); *S.E.C. v. One or More Unknown Purchasers of Sec. of Telvent GIT, SA*, No. 11 Civ. 3794 (S.D.N.Y. July 13, 2011), ECF 11 (granting preliminary injunction freezing assets where John Doe defendants purchased 1,200 call options days before a company's acquisition announcement, and exercised them two days after the announcement, reaping outsized profits on the rise in stock price); Order Granting Preliminary Injunction at 1, 3–4, *S.E.C. v. One or More Unknown Purchasers of Options of Intermune, Inc.*, No. 10 Civ. 09560 (S.D.N.Y. Jan. 7, 2011), ECF 4 (granting preliminary injunction where John Doe defendants engaged in suspicious pattern of call options purchases through omnibus account just weeks before announcement of regulatory approval of company's product).[8]

More broadly, and as discussed in the following section, courts have likewise routinely granted preliminary injunctions pursuant to the serious questions doctrine in complex cases such as this. As discussed herein, the sufficiently serious questions doctrine

---

[8] An appendix of these ECF documents is attached hereto as Exhibit B.

remains controlling law in this Circuit, and Plaintiffs submit that this standard is applicable to this case. While the SEC was the plaintiff in the above-referenced cases, and thus could rely on a standard either of (1) a likelihood of success on the merits or (2) "that an inference can be drawn that the party has violated the federal securities laws," *Smith v. S.E.C.*, 653 F.3d 121, 128 (2d Cir. 2011) (quotation omitted), the case law described above is instructive because the latter standard is practically comparable to the "sufficiently serious questions going to the merits to make them a fair ground for litigation" standard available to private litigants. In *Unifund*, the Second Circuit addressed whether the SEC could avail itself of the "serious questions" standard and noted the similarity in the burdens between the "serious questions" test and the SEC's requirements for securing an asset freeze or other ancillary preliminary relief, concluding that "[i]n practice, the absence of the [serious questions] test as an articulated standard may not have much significance." *Unifund SAL*, 910 F.2d at 1040.

As in the SEC precedents, the trading data that are currently available provide a sufficient basis for a preliminary injunction. As explained above, it is difficult to conceive of any plausible scenario in which an insider's tipping of highly confidential and sensitive MNPI in violation of law and clear corporate policies, resulting in tippees making highly lucrative trades, would *not* involve a personal benefit. One possible scenario is if the tipper is motivated by a desire to disclose misconduct. *See Dirks v. S.E.C.*, 463 U.S. 646, 667 (1983) (no personal benefit where "the tippers were motivated by a desire to expose the fraud"). However, such a fact pattern is plainly not present here, as the MNPI in this case concerned *an imminent government enforcement action* about underlying corporate misconduct. In other words, the alleged misconduct was already known to government investigators and the alleged perpetrators of the misconduct; the government had conducted an investigation and was about to publicly announce significant penalties against the violators. There is no reasonable corporate whistleblowing scenario involving the disclosure of information about an imminent government enforcement action *against alleged corporate misconduct*.

The Court raised a hypothetical scenario in which an inebriated tipper may have disclosed information about the Crackdown News to friends at a bar. That scenario would involve the gifting of a valuable tip to friends, and thus a personal benefit. See *Dirks*, 463 U.S. at 664 (personal benefit arises "when an insider makes a gift of confidential information to a trading relative or friend"); *see also Salman v. United States*, 580 U.S. 39, 49–50 (2016) ("*Dirks* specifies that when a tipper gives inside information to 'a trading relative or friend,' the jury can infer that the tipper meant to provide the equivalent of a cash gift. In such situations, the tipper benefits personally because giving a gift of trading information is the same thing as trading by the tipper followed by a gift of the proceeds"); *S.E.C. v. Obus*, 693 F.3d 276, 291 (2d Cir. 2012) ("[T]he undisputed fact that Strickland and Black were friends from college is sufficient to send to the jury the question of whether Strickland received a benefit from tipping Black"). Drunkenness may explain why someone would make a foolish decision to commit a criminal act, but it does not negate the personal benefit that comes from tipping information to friends.

5. **Authority that the "sufficiently serious questions going to the merits" standard is still valid law in the Second Circuit (August 17 Order at ¶ 3(5)).**

The Second Circuit directly affirmed the "sufficiently serious questions going to the merits" standard in *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010). In *Citigroup*, the court observed that "[f]or the last five decades, this circuit has required a party seeking a preliminary injunction to show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Id.* at 35 (internal quotation marks omitted). In response to arguments that Supreme Court precedent had foreclosed the Second Circuit's longstanding "serious questions" standard, the *Citigroup* court stated that "our venerable standard for assessing a movant's probability of success on the merits remains valid". *Id.* at 38. The court further emphasized that "[n]one of the [Supreme Court] cases comments at all, much less negatively, upon the application of a preliminary injunction standard that softens a strict 'likelihood' requirement in cases that warrant it." *Id.* at 37. The decision also emphasized the flexibility of the preliminary injunction standard in this circuit:

> The value of this circuit's approach to assessing the merits of a claim at the preliminary injunction stage lies in its flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation. Preliminary injunctions should not be mechanically confined to cases that are simple or easy. Requiring in every case a showing that ultimate success on the merits is more likely than not 'is unacceptable as a general rule. The very purpose of an injunction ... is to give temporary relief based on a preliminary estimate of the strength of plaintiff's suit, prior to the resolution at trial of the factual disputes and difficulties presented by the case. Limiting the preliminary injunction to cases that do not present significant difficulties would deprive the remedy of much of its utility.'"

*Id.* at 35–36 (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.3 (2d ed. 2009)). The Second Circuit has continued to recognize the validity of the "serious questions" standard in more recent cases. *See, e.g.*, *Cumulus Media New Holdings Inc. v. Nielsen Co. (US), LLC*, 182 F.4th 108 (2d Cir. 2026); *Real Est. Bd. of New York, Inc. v. City of New York*, 182 F.4th 140, 163 (2d Cir. 2026); *Mendez v. Banks*, 65 F.4th 56 (2d Cir. 2023). And district courts in the Second Circuit have continued to rely on the "serious questions" standard in granting preliminary injunctions. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Atl. Med. & Diagnostic, P.C.,* 26-CV-1084, 2026 WL 1162795, at *1, 5 (E.D.N.Y. Apr. 29, 2026) (referencing the "flexibility" of the "serious questions" standard in granting a preliminary injunction related to an alleged kickback scheme, and noting that the defendants' counterarguments to plaintiffs' allegations "merely

reflect[] serious questions going to the merits"); *Vozzolo v. Air Canada*, 20-CV-03503, 2021 WL 5113387, at *1, 7 (S.D.N.Y. Nov. 3, 2021) (granting a preliminary injunction based on the "serious questions" standard because, while the court was "unable to determine with the requisite certainty" a key element of the plaintiffs' claim, the court concluded that "[p]laintiffs' motion and the proof submitted by the parties, however, raise[d] substantially serious questions going to the merits").

While Plaintiffs respectfully submit that they have demonstrated a "likelihood of success on the merits," they have at the very least demonstrated "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup*, 598 F.3d at 35 (2d Cir. 2010). As the Second Circuit stated in *Citigroup*, the "serious questions" standard recognizes that "[p]reliminary injunctions should not be mechanically confined to cases that are simple or easy." 598 F.3d at 35. It further acknowledged "the greater uncertainties inherent at the outset of particularly complex litigation." *Id.*

This is one such "complex" case, in which the limited information available to Plaintiffs at this early stage demonstrates that the Narrowed Defendants likely engaged in an extensive and lucrative insider trading scheme. The "serious questions" standard enables Plaintiffs to obtain a preliminary injunction to prevent the dissipation of the proceeds of the alleged scheme even if the Court declines to conclude, based on the preliminary factual record, that Plaintiffs are likely to succeed on the merits. Plaintiffs submit that they have met that threshold in any event.

6. **Explanation of whether or not plaintiffs' unjust enrichment claim relies on establishing the elements of plaintiffs' securities claim, including that the tipper received a benefit (August 17 Order at ¶ 3(6)).**

In addition to satisfying their required showing on the insider trading claim pursuant to Section 20A of the Exchange Act, Plaintiffs have separately made that showing as to their unjust enrichment claim.[9] The preliminary injunction may be based on this claim alone. The elements of unjust enrichment are: (1) a benefit obtained by defendants; (2) at the plaintiffs' expense; and (3) equity and good conscience require restitution. *See, e.g.*, *Myun-UK Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018).

Plaintiffs' unjust enrichment claim provides an independent basis for issuing a preliminary injunction, and it does not necessarily rely on establishing the elements of Plaintiffs' securities claim, including that the tipper received a benefit. This is because, unlike Plaintiffs' insider trading claim under Section 20A of the Exchange Act, an unjust

[9] It is sufficient for purposes of a preliminary injunction for Plaintiffs to establish a likelihood of success or sufficiently serious questions on *either* their 20A claim or their unjust enrichment claim. *See New York v. Admin. for Child. & Fams.*, No. 26 Civ. 172 (VSB), 2026 WL 673848, at n.5 (S.D.N.Y. Mar. 10, 2026) ("To obtain a preliminary injunction, Plaintiff need not establish a likelihood of success on every claim. . . . It is sufficient to establish likelihood of success on the merits of only one of its claims") (citations and quotations omitted).

enrichment claim rests on broad equitable considerations and does *not* require a showing that the defendant breached a duty or engaged in any wrongdoing at all. *See Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) (stating that a claim for unjust enrichment is available "when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an obligation running from the defendant to the plaintiff").

To the contrary, "[t]ypical cases [of unjust enrichment] are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." *Id.; see also Marini v. Adamo*, 995 F. Supp. 2d 155, 204 (E.D.N.Y. 2014), *aff'd,* 644 F. App'x 33 (2d Cir. 2016) (affirming that "[i]nnocent parties may frequently be unjustly enriched" and "plaintiffs [did] not need to demonstrate that [defendant] committed a wrongful act to find her liable on an unjust enrichment claim" because defendant "could be liable for unjust enrichment as a gratuitous donee of some of the wrongfully acquired funds") (internal quotations omitted); *Metro. Bank & Tr. Co. v. Lopez*, 137 N.Y.S.3d 319 (N.Y. App. Div. 1st Dep. 2020) (denying motion to dismiss an unjust enrichment claim against a defendant who was the recipient of funds that his father had embezzled). Applying these principles to a version of the Court's hypothetical—in which a tipper drunkenly divulges inside information to random people at a bar for no reason at all—unjust enrichment would still provide a remedy for a plaintiff who lost money in a trade with the bar customer who traded based on the tip.

With respect to the first two elements, the trading records support the allegation that the Narrowed Defendants financially benefited at Plaintiffs' direct expense by trading high-risk securities on the basis of material information that was not known to the market as a whole. *See* ECF 103, 105, Wickman Decl. ¶¶ 5-8; ECF 1, Susquehanna Compl. ¶¶ 32-33; ECF 21-1, Citadel Securities Compl. ¶¶ 31-33. Whether the Narrowed Defendants obtained such information in breach of duty or as a result of a tipping scheme, is irrelevant to the core question of whether they were unjustly enriched.

The final element of unjust enrichment—whether "equity and good conscience require defendant to make restitution"— "depends upon broad considerations of equity and justice." *Masonic Med. Rsch. Lab'y v. Antzelevitch*, No. 6:16-CV-754, 2017 WL 11676241, at *14 (N.D.N.Y. Mar. 23, 2017) (quotation omitted). The concept of informational symmetry concerning material information disclosed by public companies is a core tenet of the securities laws, most notably in the form of Regulation FD, which prohibits public companies from providing selective disclosure of market moving information to only certain constituencies, as well as Rule 14e-3 of the Exchange Act, which prohibits trading on the basis of MNPI in the tender offer context even in the absence of any breach of fiduciary duty or tipping activity.[10]

[10] *See* 17 C.F.R. Part 243 (Reg FD); 17 C.F.R. § 240.14e-3 (Exchange Act Rule 14e-3); *see also Sec. & Exch. Comm'n v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968) (recognizing "the justifiable expectation of the securities marketplace that all investors trading on impersonal exchanges have relatively equal access to material information").

Here, Plaintiffs were victimized in their role as market makers subject to a regulatory obligation to provide liquidity in securities—like FUTU and TIGR—listed on national securities exchanges. Market makers operate on the presumption that market participants are presenting trades to them in good faith, without the benefit of highly material information not broadly known to the market. By contrast, however, the Narrowed Defendants' trading activity—including the timing of the trades, the well-timed expiration dates of the put option contracts shortly after the Crackdown News, and the volume of options contracts purchased—is strongly suggestive of the fact that the Narrowed Defendants were likely trading based on MNPI that they (and not Plaintiffs) possessed. *See* ECF 103, 105, Wickman Decl. Ex. D. This fact pattern reflects plainly inequitable conduct that in good conscience should be redressed, thus satisfying the final element of the unjust enrichment claim.

In sum, the trading data before the Court demonstrates that the Narrowed Defendants' use of MNPI to generate significant profits for themselves—and significant losses for Plaintiffs—is sufficient to establish Plaintiffs' likelihood of success on the merits (or sufficiently serious questions) for the unjust enrichment claim.

Respectfully submitted,

*/s/ John N. Orsini*

John N. Orsini

cc: All counsel of record (*by ECF*)